Opinion
BAXTER, J.
Christine Barrett is an adult who has long been diagnosed with mental retardation and other mental disorders, and who has lived in the community while being supported and supervised by others. Because of her increasingly violent behavior, Barrett became the subject of this proceeding to civilly commit her as a “mentally retarded person” who is a “danger” to herself or others. (Welf. & Inst. Code,[1] § 6500 (section 6500).)[2] The People sought placement in a secure treatment facility pursuant to the statutory scheme.
Following a nonjury trial in which Barrett was represented by counsel, the trial court sustained the allegations of the petition. The court ordered her *1089 committed for one year to the State Department of Developmental Services (Department), and otherwise approved the requested placement. The judgment was affirmed on appeal. This court granted Barrett’s petition for review.
We now decide whether the Court of Appeal properly rejected Barrett’s claims that she was denied due process and equal protection of the law insofar as the record does not reveal the circumstances under which she was tried by the court, rather than by a jury. The statutory scheme does not expressly provide either for a right to jury trial or for any related requirement that an alleged mentally retarded person be advised of, or allowed to personally act upon, any such right. Nevertheless, the parties do not dispute that Barrett was entitled under long-standing equal protection principles to a jury unless a jury was validly waived.
Critical here is that Barrett further insists the trial court was constitutionally compelled to (1) expressly advise her that she could request a jury and (2) obtain her personal waiver of a jury, before holding a bench trial and deciding all commitment issues itself. Because the record does not show whether such procedures occurred here, Barrett views the commitment order as inherently unsound and reversible per se. We disagree, and find no constitutional violation.
Barrett’s due process and equal protection theories share the same flawed premise. The section 6500 procedure itself undermines Barrett’s assumption that persons alleged to be mentally retarded and dangerous can necessarily decide for themselves, in a knowing and intelligent manner, whether to demand a jury at their commitment trials. As we explain, that process is initiated, and proceeds from the outset, on the basis of strong evidence that the individual facing commitment has cognitive and intellectual impairments that would prevent him or her from making a meaningful decision whether to invoke, or waive, the right to a jury trial. The person’s rights and interests are nonetheless protected by the state’s statutory obligation to provide counsel in section 6500 proceedings.
Accordingly, consistent with closely related decisions of this court, and given the mental competence issues addressed in section 6500 proceedings as compared to other commitment scenarios, we conclude it is counsel who must make the tactical decision whether to seek or waive a jury. To encumber the jury trial right with a collateral requirement that any waiver be personally made by the proposed committee following a formal court advisement would serve no useful purpose in this context. This approach does not undermine the fairness of the proceedings in a due process sense, or treat dangerous mentally retarded persons differently from those with whom they are aligned for equal protection purposes. We therefore will affirm the judgment.
*1090 I. CASE HISTORY
On January 22, 2009, the district attorney, acting on the People’s behalf, filed a petition in Santa Clara County Superior Court to commit Barrett under section 6500. According to the petition, Barrett lived in a private residence with staff assistance. The party responsible for her care, maintenance, and support was the San Andreas Regional Center (Center).[3] The Center’s service coordinator, Betty Crane, was the person who requested that the petition be filed.
The petition further alleged that Barrett was mentally retarded and dangerous to herself and others. On this basis, the court was asked to hold an evidentiary hearing and to order Barrett committed to the Department for care, custody, and treatment for a period not exceeding one year. In providing reasons for filing the commitment petition, the district attorney relied on “the assessment, evaluations, reports and other documents” of the Center and the Department. These materials were incorporated by reference into the petition, and were filed at the same time in the form of a confidential exhibit.
On the day the petition was filed, the trial court set a hearing for March 9, 2009. Pending the hearing, the court also ordered Barrett’s interim placement under the Department’s care in a particular secure treatment facility.
Counsel for both parties appeared in court on March 9. Although a court reporter was also present, no reported proceedings occurred and no transcript was prepared. As noted by the Court of Appeal, the only record of the hearing is a printed minute order. It indicates, in an abbreviated handwritten note, that the matter was continued to April 8, 2009, at 10:00 a.m., for a two-hour hearing. The March 9 minute order contains no other substantive information.
On April 8, the trial court began the proceeding at the scheduled time. Barrett and counsel for both parties were present in the courtroom. Counsel agreed that the previous two-hour estimate accurately reflected the total amount of time needed to present evidence and try the case. The People then called Dr. Robert Thomas, their first and only witness, to the stand. Nothing in the reporter’s transcript indicates that any mention of trial by jury occurred.
Dr. Thomas was a psychologist at the Center who qualified as an expert witness on mental retardation, and who had examined Barrett and reviewed *1091 her case history. He testified that Barrett, then age 27, was mentally retarded. She had an IQ in the “50’s to 40’s”—a level deemed “moderate” in the sense that it was neither mild nor severe. Dr. Thomas based this conclusion, in part, on school records and psychological reports from early in Barrett’s life, before she became a client of the Center in 2001.[4]
Dr. Thomas further opined that because of cognitive deficits associated with her mental retardation, Barrett had serious difficulty controlling her behavior, and was a danger to herself and others. This determination rested on two main factors: (1) Barrett’s incapacity “to understand the complexity of her disorder and the need for treatment” and (2) her volatile and violent history, as set forth in “incident reports” compiled by the Center.[5]
Dr. Thomas explained that Barrett had lived at home with her parents until 2001. Because of physical assaults and verbal abuse against her parents, and noncompliance with her treatment plan, Barrett was placed in a residential facility, or group home. This facility, where Barrett stayed for five years, was well staffed and closely monitored. However, according to Dr. Thomas, Barrett repeatedly left the premises without proper notice and supervision, and disrupted the community by “threatening people” and acting in “inappropriate” and “self-destructive” ways. Similar problems arose inside the facility, often triggering an emergency response and psychiatric hospitalization.
Dr. Thomas testified that, beginning in 2006, Barrett was moved into a condominium that her parents owned. This arrangement was facilitated by support staff trained to help persons like Barrett live independently. According to Dr. Thomas, Barrett’s outbursts continued. The Center documented 30 incidents in the 18-month period before the hearing. Typically, Barrett became agitated about personal matters, and responded by assaulting family members or staff, damaging property, and committing certain forms of *1092 self-abuse. Dr. Thomas noted that “furniture and pictures and all kinds of things had to be removed from her apartment just to keep her safe.”[6]
In light of this evidence, Dr. Thomas recommended that Barrett be committed to a particular secure treatment facility—the same one that was serving as interim housing at the time of the hearing. He explained that it was the least restrictive placement. Barrett’s history showed that she could not safely reside in either a less secure group home or an independent living situation.
Barrett testified as the only witness on her behalf. She did not like her current placement because, even though the people were nice and the food was good, she could not go on outings and preferred the group home. She liked her medication because it calmed her, but denied being mentally disordered.
Following closing argument, the trial court found that, notwithstanding any other disorders, Barrett was mentally retarded and dangerous under section 6500, and that the danger she posed to herself and others was based upon, and caused by, her mental retardation. She was committed to the Department for one year beginning on April 8, 2009, the date of the hearing. The court designated the secure treatment facility then being used as interim housing as the least restrictive and most appropriate placement.[7]
*1093 On appeal, Barrett focused on the lack of a jury at her commitment trial. Based on the premise that she had a constitutional right to a jury decision on the allegations of the petition, Barrett argued that due process and equal protection principles were violated insofar as the record did not show that the trial court advised her of the right to a jury, or elicited a valid waiver of that right before holding a bench trial. She relied on two cases—both from the Third District Court of Appeal—imposing these requirements in section 6500 proceedings. (People v. Alvas (1990) 221 Cal.App.3d 1459 [271 Cal.Rptr. 131] (Alvas); see id. at pp. 1463-1464 [recognizing equal protection right to personal jury advisement like the one given to dangerous mentally ill persons under § 5302, part of the Lanterman-Petris-Short (LPS) Act (§ 5000 et seq.)], pp. 1464-1465 [concluding that jury waiver is uninformed and invalid for due process purposes absent an express personal advisement]; accord, People v. Bailie (2006) 144 Cal.App.4th 841, 847 [50 Cal.Rptr.3d 761] (Bailie) [reaffirming Alvas on equal protection grounds, and declining to reexamine Alvas’s due process analysis].)
Here, however, a unanimous Sixth District Court of Appeal panel rejected the Third District’s approach as an aberrant departure from settled law. The instant Court of Appeal observed that except for Alvas, supra, 221 Cal.App.3d 1459, and Bailie, supra, 144 Cal.App.4th 841, California courts have never placed any procedural conditions on the manner in which the defense demands or declines a jury under section 6500. This approach warranted rejection of Barrett’s constitutional claims, the court said, because her competence on jury trial matters was in doubt given the nature of the issues raised under section 6500. The Court of Appeal further reasoned that the failure of the defense to request a jury generally waives the right, and that the apparent absence of such a request here precluded a finding that a jury had been wrongly denied. The judgment was affirmed. Barrett sought review.
II. STATUTORY BACKGROUND
California has no fewer than nine involuntary commitment procedures that may apply to persons who have various mental problems, and who pose a threat to their own welfare or to the safety of others. Some of these laws, including section 6500 et seq., operate in a manner largely independent of the criminal justice system. (See §§ 4825 [developmentally disabled persons under the LDDSA], 5000 et seq. [mentally ill persons under the LPS Act].) Others apply depending on whether a criminal prosecution has occurred. (See § 3000 et seq. [narcotic addicts whether or not they have been convicted of crimes].) Certain accused criminals may receive a mental health commitment *1094 in lieu of conviction and punishment. (See Pen. Code, §§ 1026-1027 [defendants acquitted by reason of insanity], 1367 et seq. [defendants found mentally incompetent].) Also, dangerously disordered offenders may be held upon discharge by the juvenile authorities (see Welf. & Inst. Code, § 1800 et seq.), or after serving a prison term (see § 6600 et seq. [sexually violent predators]; Pen. Code, § 2960 et seq. [mentally disordered offenders]).
The statutory scheme applied here has been in effect for over 40 years.[8] The basic rule is that “no mentally retarded person may be committed” to the Department “unless he or she is a danger to himself or herself, or others.” (Former § 6500.) Dangerousness includes a finding of incompetence to stand trial under Penal Code section 1367 et seq., for accused criminals in certain serious and violent cases. (Welf. & Inst. Code, § 6500.) For mentally retarded persons under the care or treatment of a state hospital or other facility when the petition is filed, proof of a recent overt act is not needed to find them to be a danger to themselves or others. (Ibid.)
A section 6500 proceeding commences under certain conditions. First, designated persons “may request” that a petition for commitment be filed by an “authorized” official, as discussed further below. (§ 6502.)[9] In general, individuals allowed to make this “request” are those charged with the support of the mentally retarded person, are representatives of the juvenile or criminal justice system, are designated by the court, or—as in the present case—serve as the director of a regional center, or as his or her designee. (§ 6502.)[10] This *1095 provision appears to assume that the requesting party is familiar with the person sought to be committed, or has access to relevant information about the person’s condition and history. Indeed, any “request” made under section 6502 must document or otherwise state “reasons” for asserting that the person is eligible for commitment. Any request containing such information also must be “verified by affidavit.” (Ibid.)
Second, allegations that a person is mentally retarded and dangerous are presented to the superior court in petition form by either the district attorney or county counsel, as determined by the county board of supervisors. (§ 6500; see § 6502.) Where a petition is filed, the court appoints the director of the regional center, or a designee, to examine the person and submit a written report. (§ 6504.5.)[11] The report must include an evaluation of the person, as well as a recommendation for placement both on an interim basis pending the evidentiary hearing and after any commitment decision is made. (§ 6504.5; see §§ 6506, 6509, subd. (a).) Relevant factors include the least restrictive residential option needed to achieve treatment goals and maintain public safety. (§ 6504.5.) A separate report along similar lines may be submitted by any developmental center recommended for placement in the regional center report. (Ibid.)
Within a limited time after the petition is filed, the court must set an evidentiary hearing. (§ 6503; see § 6504 [notice of hearing].) A suitable interim placement may be ordered pending the hearing, with consideration given to the, reports and recommendations of the regional center and any developmental center involved in the case. Again, relevant concerns include the least restrictive arrangement that promotes treatment and protects public safety. (§ 6506.)
*1096 The process of hearing and commitment includes substantial procedural safeguards. Thus, for persons who lack their own attorney, the court “shall immediately appoint” counsel to represent them. (§ 6500.)[12] The court is also directed to “inquire” into the person’s condition, and to thereby enhance the availability of evidence on this issue. (§ 6507.) Thus, the court may subpoena qualified physicians and psychologists to examine the person and to testify about his or her “mentality.” (Ibid.) The attendance of other witnesses also may be compelled. (Ibid.; see § 6508 [authorizing witness fees and expenses].)
The requisite findings of mental retardation and dangerousness allow the person to be “committed to the [Department] for suitable treatment and habilitation services.” (§ 6509, subd. (a).) The same statute requires selection of the “least restrictive residential placement” to meet these goals, identifies a range of available facilities (e.g., state hospitals and community care centers), and permits other appropriate dispositions (e.g., conditional release into the community) that do not risk the welfare of the person or the public. (Ibid.) Specific procedures guide the court in selecting an appropriate placement, including consideration of the regional center report submitted under section 6504.5. (§ 6509, subd. (a).)
An order of commitment “expire[s] automatically one year after” it is made. (§ 6500.) Subsequent commitments for additional periods may be sought for persons who remain mentally retarded and dangerous. Recommitment procedures are “the same as with an initial petition for commitment.” (Ibid.)
III. DISCUSSION
Preliminarily, no statute by its plain terms authorizes a jury to determine whether someone is mentally retarded and dangerous for purposes of a section 6500 commitment. The lack of any jury trial provision distinguishes the statutory procedures regulating section 6500 proceedings from most other involuntary commitment schemes, as we discuss further below.
Nevertheless, here, as in the Court of Appeal, there is no dispute that someone facing commitment under section 6500 et seq. has the right to trial by jury on the allegations of the petition. Neither party rests this premise on any provision of the federal or state Constitution that directly or expressly *1097 grants the right to a jury in criminal or civil trials.[13] Rather, they invoke a long and unbroken line of California appellate court cases holding or assuming—largely on the basis of federal and state equal protection principles affecting fundamental interests—that persons alleged to be mentally retarded and dangerous cannot be denied a jury altogether where jury trials are granted by statute to persons alleged to be mentally impaired and dangerous under comparable commitment laws. Thus, persons like Barrett “are entitled to jury trial upon request.” (O’Brien v. Superior Court (1976) 61 Cal.App.3d 62, 69 [132 Cal.Rptr. 13].)[14]
We now assess the adequacy of this basic rule, and decide whether additional adjunct procedures must be followed in open court for a valid nonjury trial to occur. Each of Barrett’s theories under the due process and equal protection clauses of the federal and state Constitutions is examined in turn.
A. Due Process Claim
Barrett contends it is not sufficient for federal and state due process purposes that the courts have implied a right to trial by jury to protect the interests at stake in section 6500 proceedings. She claims the jury trial option needs its own supplemental layer of support. In other words, the decision whether to try the case to the court or to a jury belongs solely to the person facing commitment, and it must be made personally, not through counsel. Under this view, any waiver of a jury trial is not knowing and intelligent, and is invalid, unless the court first expressly advises the person of that right. *1098 Because the record shows no such express advisement and personal waiver here, Barrett insists a structural defect in the proceeding occurred, and that automatic reversal of the judgment is compelled.
The People reply that persons alleged to be mentally retarded should be treated no differently from defendants in certain other kinds of commitment trials who, because of their alleged mental impairments, lack sufficient capacity to personally understand and implement the jury trial right, or to override any contrary decision by counsel. Alluding to the rules generally applicable in civil cases, the People insist a waiver meets due process requirements where, as here, the record does not show that counsel, who presumably made an informed and competent decision in this regard, requested a jury before the section 6500 trial began.[15] The People have the better view.
This court observed long ago that section 6500 proceedings are not criminal in nature, and that commitment under this scheme, though involuntary, is not punishment. (Cramer v. Tyars (1979) 23 Cal.3d 131, 137 [151 Cal.Rptr. 653, 588 P.2d 793] [denying alleged mentally retarded and dangerous persons an absolute right under § 6500 similar to the one held by criminal defendants not to be called as a witness].) “The sole state interest, legislatively expressed, is the custodial care, diagnosis, treatment, and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community.” (Cramer v. Tyars, at p. 137.)
But civil commitment for any purpose can affect liberty and other vital interests. (Addington v. Texas (1979) 441 U.S. 418, 425-426 [60 L.Ed.2d 323, 99 S.Ct. 1804] (Addington); People v. Allen (2008) 44 Cal.4th 843, 862 [80 Cal.Rptr.3d 183, 187 P.3d 1018] (Allen).) Hence, due process safeguards apply whether the proceeding concerns mentally retarded and dangerous persons (e.g., Heller v. Doe (1993) 509 U.S. 312, 330-333 [125 L.Ed.2d 257, 113 S.Ct. 2637] (Heller)), or persons suffering from other dangerous disorders needing care and treatment (e.g., Addington, at pp. 420-421, 425-427 *1099 [mental illness in the form of paranoid schizophrenia]; Moore v. Superior Court (2010) 50 Cal.4th 802, 810, 815 [114 Cal.Rptr.3d 199, 237 P.3d 530] (Moore) [diagnosed mental disorder qualifying convicted sex offender as “sexually violent predator”]; John L, supra, 48 Cal.4th 131, 142, 150 [grave disability affecting welfare of mentally disordered person]).
Notably, the procedural safeguards required in this context are flexible (People v. Tilbury (1991) 54 Cal.3d 56, 68 [284 Cal.Rptr. 288, 813 P.2d 1318] (Tilbury)), and the quantum and quality of the process due depend upon the nature and purpose of the challenged commitment. (John L., supra, 48 Cal.4th 131, 150.) In making this determination, the courts weigh, assess, and consider various factors affected by the disputed procedure. Distilled, these considerations involve (1) the various private interests at stake, (2) any competing state or public concerns, and (3) the potential risk of an erroneous or unreliable outcome. (Ibid.; see Moore, supra, 50 Cal.4th 802, 819; Allen, supra, 44 Cal.4th 843, 862-863; Conservatorship of Ben C. (2007) 40 Cal.4th 529, 538-539 [53 Cal.Rptr.3d 856, 150 P.3d 738] (Ben C.).)
Barrett treats the first factor, involving her own due process interests, as salient here. (See Ben C., supra, 40 Cal.4th 529, 538.) She observes, and we agree, that section 6500 proceedings potentially involve a significant restraint on liberty. Whether the requisite findings of mental retardation and dangerousness are made by the court or a jury, the person is ordered committed to the Department for up to one year. Recommitment may be sought if the person’s condition has not materially changed during that time. Although the least restrictive placement is required under the particular circumstances, several statutory options involve custodial control. They include confinement in a secure facility to treat the mentally retarded person and to protect the public from the dangers that he or she presents. (See §§ 6500, 6509, subd. (a).) Such was the case with Barrett.
In addition, we have said that persons facing commitment have a “ ‘dignitary interest’ ” in being informed of the “ ‘nature, grounds, and consequences’ ” of the proceeding, and in presenting “ ‘their side of the story’ ” before a determination is made. (Allen, supra, 44 Cal.4th 843, 862; see id. at p. 868 [identifying statutory procedures that protect due process dignitary interests of alleged sexually violent predators under § 6600 et seq.]; accord, Moore, supra, 50 Cal.4th 802, 819, 824.) It bears emphasis that Barrett does not highlight this factor, or identify any specific flaws in the statutory scheme in this regard. (See §§ 6502 [petition must be supported by verified “request” from informed party, and must state “reasons” for commitment], 6504 [notice of hearing], 6504.5 [mental examination and written report required by regional center director or designee], 6500 [right to counsel], 6507 [availability of expert testimony and other witnesses on mental retardation].)
*1100 As Barrett suggests, the foregoing interests have been deemed sufficiently fundamental to implicate certain constitutional jury trial concerns in commitment cases, at least in those relatively few instances in which a right to trial by jury has not been legislatively prescribed. It does not follow, however, that the jury trial option implied by the courts in section 6500 proceedings is illusory unless accompanied by the ancillary procedures Barrett seeks. Nor do such procedures necessarily amount to independent constitutional rights applicable in every case. Instead, their due process availability depends, in a particular instance, on a careful balancing of the public and private interests described above.
In this regard, Barrett fails to consider, and we must now address, the special character of the commitment proceeding at issue. This consideration undermines her due process claim.
The controlling principles appear in our unanimous decision in People v. Masterson (1994) 8 Cal.4th 965 [35 Cal.Rptr.2d 679, 884 P.2d 136] (Masterson). There, the defendant was charged by felony complaint with violent crimes. Before the preliminary hearing, the magistrate declared a doubt as to the defendant’s mental competence to stand trial. (See Pen. Code, § 1367.) The matter was sent to the superior court for a competence hearing.
For the hearing, a panel of 12 jurors was chosen to hear evidence and decide competence. Shortly before the presentation of evidence was set to begin, counsel for both sides and the defendant were present in court. However, only 11 jurors appeared. The 12th juror apparently was missing. The prosecutor and defense counsel agreed that the matter could be tried by a jury consisting of the 11 panelists in court at the time. When asked by the trial court whether he understood this stipulation, the defendant made clear that he rejected its terms. He told the court that he would “ ‘rather have 12 jurors.’ ” (Masterson, supra, 8 Cal.4th 965, 967.) When asked pointblank if he objected to the stipulation allowing an 11-person jury, the defendant said, “ ‘Yes.’ ” (Id. at p. 968.)
Over the defendant’s objection, and consistent with counsel’s approach, the competence trial was held in front of only 11 jurors. They unanimously found the defendant mentally competent. A different jury then convicted him of the charged crimes. On appeal, the judgment was reversed on the ground that use of an 11-person jury to decide competence over the defendant’s personal objection constituted prejudicial error. This court reversed the Court of Appeal.
The critical question in Masterson was whether defense counsel could “waive the right to a jury trial entirely,” even if the defendant objected. *1101 (Masterson, supra, 8 Cal.4th 965, 968.) If so, counsel would necessarily have the lesser authority, so to speak, of agreeing to a jury of fewer than the usual 12 persons. (Id. at p. 969; see Cal. Const., art. I, § 16; Code Civ. Proc., § 220.)
Masterson first emphasized that in all cases, civil and criminal, “ ‘a party’s attorney has general authority to control the procedural aspects of the litigation and, indeed, to bind the client in these matters’ . . . .” Counsel, not the client, “ ‘is captain of the ship.’ ” (Masterson, supra, 8 Cal.4th 965, 969.)
Of course, an exception to this broad rule exists in criminal cases in which the defendant has a state constitutional right to a jury trial that can only be expressly and personally waived. (Masterson, supra, 8 Cal.4th 965, 969, citing Cal. Const., art. I, § 16, and People v. Ernst (1994) 8 Cal.4th 441 [34 Cal.Rptr.2d 238, 881 P.2d 298].) Masterson observed, however, that a mental competence proceeding, though a byproduct of the underlying criminal prosecution, is not itself a criminal action in which the state constitutional requirement of an express personal waiver applies. Nor is it a civil action. It is a “ ‘special proceeding’ ” in which the right to trial by jury is wholly statutory. (Masterson, at p. 969; see Pen. Code, § 1369, subds. (a)-(f) [describing mental examinations, evidence, argument, and instructions in any “trial by court or jury of the question of mental competence”].)
Against this backdrop, Masterson concluded that it “need not decide” whether the statutory nature of the jury trial right in a criminal mental competence proceeding dictates the circumstances under which it can be waived, i.e., whether there are some statutory rights that counsel may not waive on the client’s behalf or over his objection. (Masterson, supra, 8 Cal.4th 965, 970.) Rather, the validity of counsel’s decision to dispense with a 12-person jury—like the larger question whether to have a jury at all—rested primarily upon “the nature of competency proceedings” and the issues addressed therein. (Id. at p. 971.)
Masterson then made the following key point: “The sole purpose of a competency proceeding is to determine the defendant’s present mental competence, i.e., whether the defendant is able to understand the nature of the criminal proceedings and to assist counsel in a rational manner. [Citations.] Because of this, the defendant necessarily plays a lesser personal role in the proceeding than in a trial of guilt. How can a person whose competence is in doubt make basic decisions regarding the conduct of a proceeding to determine that very question?” (Masterson, supra, 8 Cal.4th 965, 971.)
In answering this question adversely to the defendant, Masterson relied heavily on People v. Hill (1967) 67 Cal.2d 105 [60 Cal.Rptr. 234, 429 P.2d *1102 586] (Hill). In Hill, after both the trial court and defense counsel expressed doubt about an alleged felon’s mental competence, a hearing was held in which the defendant received new counsel. For reasons not clear from the record, the competence issue was tried by the court, not a jury. The trial court found the defendant competent and he was later tried and convicted of the charged crimes. Ultimately, in Hill, this court rejected the defendant’s claim that his convictions should be reversed because, in the competence proceeding, he had not personally waived a jury, or been advised either by the court or counsel of his right to request a jury trial.
As noted in Masterson, supra, 8 Cal.4th 965, 971, this court made clear in Hill, supra, 67 Cal.2d 105, 114, that there is “no duty in a judge” to advise the defendant about his jury trial right in a mental competency proceeding, at least where he or she is represented by counsel. Also, Masterson observed, when the preliminary evidence is sufficient to trigger a mental competence hearing, “ ‘it should be assumed that [the defendant] is unable to act in his own best interests. In such circumstances counsel must be free to act even contrary to the express desires of his client.’ ” (Masterson, at p. 971, quoting Hill, at p. 115, fn. 4.) According to Masterson, it is settled that, “ ‘as a matter of tactics counsel may, without consulting defendant, waive defendant’s statutory right to demand that a jury decide his competence.’ ” (Masterson, at p. 972, quoting People v. Samuel (1981) 29 Cal.3d 489, 496 [174 Cal.Rptr. 684, 629 P.2d 485] [summarizing Hill).)
Accordingly, Masterson held that “counsel may waive the right to a jury trial in a competency proceeding, and the court need not advise the defendant of that right.” (Masterson, supra, 8 Cal.4th 965, 972.) Hence, Masterson concluded, no error occurred insofar as counsel stipulated to a jury of 11 persons. It also made no difference that the defendant in Masterson had personally opposed the stipulation in open court. In light of the initial doubts expressed about his mental competence (which the 11-person jury did not sustain), the defendant could not “veto” counsel’s professional judgment or decisional authority in jury trial matters. (Id. at p. 973.)[16]
*1103 Not surprisingly, this court has determined that persons who are mentally impaired for reasons other than those present in Masterson, supra, 8 Cal.4th 965, also cannot “ ' “act in [their] own best interests” ’ ” when committed. (Id. at p. 971.) (See, e.g., Hop, supra, 29 Cal.3d 82, 90-91 [developmentally disabled adult too incompetent to admit herself to a mental hospital was not competent to protest or consent to hospitalization by third parties under the LDDSA (§ 4825) for purposes of determining the voluntariness of the latter process]; Thorn v. Superior Court (1970) 1 Cal.3d 666, 674-675 [83 Cal.Rptr. 600, 464 P.2d 56] [persons with acute mental disorders requiring involuntary 14-day treatment under the LPS Act (§ 5250) lack the capacity to comprehend their statutory rights, or to knowingly decide whether or not to exercise them, and thus require the assistance of counsel].)
Similar logic applies here. No definition of mental retardation appears in section 6500 or elsewhere in the statutory scheme. However, the Legislature has made clear under a neighboring law, the LDDSA, that mental retardation—like cerebral palsy, epilepsy, and autism—constitutes a “ ‘[developmental disability.’ ” (§ 4512, subd. (a).) As such, the condition “originates before an individual attains age 18 years, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual.” (Ibid.)
More to the point, it is understood for section 6500 commitment purposes that mental retardation involves “ ‘ “significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior,” and appearing in the “developmental period.” ’ ” (Money, supra, 128 Cal.App.3d 378, 397, italics added [using “ ‘generally accepted technical meaning’ ” of mental retardation to hold § 6500 is not unconstitutionally vague]; accord, Cramer v. Gillermina R. (1981) 125 Cal.App.3d 380, 387-388 [178 Cal.Rptr. 69]; see Heller, supra, 509 U.S. 312, 321-325 [accepting premise of Ky. commitment law, in dispute over constitutional standard-of-proof requirements, that mental retardation is a permanent developmental and learning disability arising before adulthood].)
Of course, as Barrett suggests, a diagnosis of mental retardation can cover a range of intellectual deficits and behavioral phenomena. (Money, supra, 128 Cal.App.3d 378, 397.) Still, the significant cognitive and intellectual deficits that the condition entails, which appear early in life and never recede, affect the ability to “make basic decisions” regarding the conduct of the section 6500 proceeding. (Masterson, supra, 8 Cal.4th 965, 971.) Such an individual thus *1104 plays a limited “personal role” in the case, and must rely on counsel to decide all tactical and procedural matters, such as whether to exercise the jury trial right. (Ibid.)
Applying these circumstances to the due process principles discussed above, we disagree with Barrett that “the private interests at stake” play a predominant or dispositive role in the analysis. (Allen, supra, 44 Cal.4th 843, 863.) We cannot ignore limits in a section 6500 proceeding on the person’s ability to comprehend and control procedural matters, including the decision whether to exercise the right to a jury trial. It follows that the collateral procedures Barrett seeks, involving an express advisement and personal waiver, would have little effect on enhancing either the jury trial right itself or the vital interests it protects. Hence, these factors do not weigh in favor of finding a constitutional violation to the extent the requested procedures were not used at her commitment trial.
Barrett further suggests that such a conclusion violates due process because it improperly “presumes” that a person is mentally retarded before the fact finder has decided the issue. Again, we are not persuaded. As we explain, no section 6500 proceeding is brought or pursued in an evidentiary vacuum or without competent support.
First, the filing of a section 6500 petition is requested by a responsible and interested party (e.g., parent, conservator, correctional or probation official, or regional center director), who presents specific information (reasons) for supposing that the person is mentally retarded and dangerous, in need of treatment, and eligible for commitment. The significance of this request, and its role in providing a foundation for the petition and commitment process, is underscored by the verification requirement. (§ 6502.) Here, the petition alleged that a request for commitment was duly made by the Center, which provided Barrett with regular care and support. In the process, the Center submitted assessments, evaluations, and reports necessary to support the allegations that Barrett was mentally retarded and dangerous. These documents were incorporated by reference into the petition and attached as an exhibit for the court’s confidential use in the section 6500 case.
Second, where a section 6500 petition is filed, the trial court is entitled to a written report prepared by, or at the behest of, the director of the regional center, following an examination of the alleged mentally retarded person. (§ 6504.5.) Regional centers specialize in assessing and assisting mentally retarded and other developmentally disabled persons on an individual basis. (See ante, at p. 1094, fn. 10.) Thus, the regional center report obviously serves as a professional pretrial evaluation of the person’s history, condition, and behavior, and includes informed recommendations on treatment and *1105 placement, including any interim placement pending the hearing. According to the petition here, the Center supplied assessments, evaluations, and reports about Barrett in seeking to commit her as mentally retarded and dangerous under section 6500.
In light of these principles and authorities, we conclude that someone like Barrett, who is alleged to be mentally retarded and dangerous under section 6500, is not in a position to personally assert or waive the right to jury trial, to sufficiently comprehend the jury trial advisement, or to override the views of counsel on the subject. Sole control over such tactical and procedural decisions rests with counsel, whether or not the client has been consulted or objects. Moreover, absent any requirement of a personal waiver, the person facing commitment has no need for an express court advisement of the right to request a jury trial. Thus, no fundamental interest requires us to hold that the nonjury trial in this case violated Barrett’s due process rights insofar as the record does not show that she personally declined a jury or was told of the right to request one.
We also agree with the People’s related suggestion that the defense must affirmatively and timely request a jury trial, and that the apparent failure to do so, reflected by the lack of evidence in the record that such a request was made, results in a valid and enforceable waiver. (See ante, at p. 1098, fn. 15 [Code Civ. Proc, § 631, subd. (f)].) As noted, a statutory right to counsel exists under section 6500. Counsel is presumed competent and informed as to applicable constitutional and statutory law. This presumption necessarily includes the defense right to seek a jury trial in a section 6500 proceeding, regardless of any court advisement. Counsel also can be expected, where necessary or advisable, to consult with the client about jury trial concerns. (See John L., supra, 48 Cal.4th 131, 154-156 [due process claim rejected on the basis of similar assumptions that counsel consulted with the client in an LPS Act conservatorship proceeding under § 5350, and knowingly entered a binding waiver of any presence and trial rights by informing the court of the client’s consent].) It follows that where no defense request for a jury trial appears on the record, we can properly infer that this omission and the ensuing bench trial were the product of an informed tactical choice. Counsel has absolute authority to bind the client. (See Masterson, supra, 8 Cal.4th 965, 972-973.) No due process interest is served by requiring counsel to expressly confirm any waiver of a jury trial in open court.
We further reject the contrary analysis in Alvas, supra, 221 Cal.App.3d 1459, 1464—1465, on which Barrett relies. In Alvas, the Court of Appeal held that a due process violation occurs, and that a section 6500 commitment following a nonjury trial is invalid, when the record fails to show that the *1106 person being committed received an express advisement and personally waived the right to a jury trial. Alvas emphasized the need for a knowing and intelligent waiver of that right. In doing so, however, Alvas ignored the factors we deem most relevant—the individual’s limited ability to personally make a jury trial decision, counsel’s sole authority to do so, and the lack of any need for a jury trial advisement in this regard. Insofar as People v. Alvas, supra, 221 Cal.App.3d 1459, is inconsistent with these conclusions, it is disapproved.
Finally, Barrett suggests that, at the very least, only the most profound cognitive impairments should prevent someone undergoing a section 6500 proceeding from being allowed to personally make the jury trial decision following a court advisement. She seems to envision a cumbersome process in which the court holds (1) a pretrial evidentiary hearing on whether the person is so mentally retarded that counsel must handle all jury trial issues and (2) a full-blown trial in which the fact finder (judge or jury) decides whether the person is so mentally retarded and dangerous as to warrant commitment.
However, when assessing competing due process concerns, courts are not blind to the “ ‘administrative burdens’ ” and “practical difficulties” of demanding new procedures. (Moore, supra, 50 Cal.4th 802, 828, quoting Allen, supra, 44 Cal.4th 843, 867; see, e.g., Tilbury, supra, 54 Cal.3d 56, 69 [noting state’s due process interest “in avoiding the cost of unnecessary jury trials” in hearings for 180-day outpatient placements for insanity acquittees under Pen. Code, § 1026.2].) No statute guides the screening procedure suggested here, including the standards of mental retardation that might apply at each phase. To the extent significant overlap exists, we are reluctant to require duplicative hearings in the context of the compact timeframe in which one-year commitments, and recommitments, occur.
Considering all of the relevant factors, we reject Barrett’s due process challenge to her nonjury trial. Nothing indicates that a valid waiver of her right to trial by jury did not occur.
B. Equal Protection Claim
Barrett argues that federal and state equal protection principles require section 6500 proceedings to involve the same jury trial safeguards that apply under the LPS Act to proceedings in which already confined patients who pose a “demonstrated danger” as a result of “mental disorder or mental defect” may be retained for a further 180 days of intensive custodial treatment. (§ 5300, subds. (a)-(c); see § 5300 et seq. [postcertification procedures for imminently dangerous persons].) Specifically, under section 5302, *1107 the superior court must give an “advise[ment]” when the 180-day LPS Act proceeding begins that, among other things, the patient has a statutory “right to demand a jury trial” on the allegations of the petition. (§ 5302; see §§ 5301 [describing petition for postcertification treatment], 5303 [authorizing “requests [for] a jury trial” at the time of the hearing on such petitions].)[17] Barrett insists that persons who are allegedly mentally retarded and dangerous under section 6500 are no different for jury trial purposes from 180-day LPS Act candidates under section 5300 et seq. Relying heavily on the equal protection analysis set forth in Alvas, supra, 221 Cal.App.3d 1459, 1463-1464, and followed by the same court in Bailie, supra, 144 Cal.App.4th 841, 844—847, Barrett claims no rational distinction exists between the two groups as to involuntary commitment, and no compelling reason for their disparate statutory treatment on jury trial advisements.
Because of the fundamental interests at stake, equal protection principles are often invoked in civil commitment cases to ensure that the statutory scheme applicable to a particular class of persons has not treated them unfairly in comparison with other groups with similar characteristics. (People v. McKee (2010) 47 Cal.4th 1172, 1199 [104 Cal.Rptr.3d 427, 223 P.3d 566], and cases cited.) A prerequisite to a meritorious claim is that individuals “ ‘similarly situated with respect to the legitimate purpose of the law receive like treatment.’ ” (Gary W, supra, 5 Cal.3d 296, 303; accord, In re Lemanuel C. (2007) 41 Cal.4th 33, 47 [58 Cal.Rptr.3d 597, 158 P.3d 148]; Cooley v. Superior Court (2002) 29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654].) Where two or more groups are properly distinguishable for purposes of the challenged law, it is immaterial if they are indistinguishable in other respects. (Cooley; supra, at p. 253.) Nor, absent this threshold requirement, is an equal protection inquiry into the justification for any legislative distinction necessary. (See Gary W, at pp. 304, 306.)
Barrett offers no analysis of the language, history, or function of section 5302 to facilitate the requisite constitutional comparison with jury trial procedures in section 6500 cases. She simply seems to assume for equal protection purposes—consistent with her views in the due process context— that the express advisement in section 5302 is intended to ensure that dangerously disordered patients facing 180-day LPS Act commitments make an informed personal choice about whether to exercise their right to request a jury trial under section 5303.
*1108 However, we need not decide the meaning or purpose of section 5302 to resolve whether equal protection requires a similar jury trial advisement in section 6500 proceedings. Nor must we address the circumstances under which a 180-day LPS Act candidate may, either acting alone or through counsel, properly waive a jury trial and submit to a court trial under section 5303. Assuming for argument’s sake that Barrett’s view of section 5302 is correct, and assuming further that dangerous mentally retarded persons and dangerous mentally disordered persons are similarly situated as to the existence of a basic jury trial right, nothing compels the conclusion that they are also similarly situated as to the ancillary purpose that an express jury trial advisement, and an express personal waiver, purportedly serve.
As the People suggest, the critical factor is the distinct “mentality” (former § 6507) covered by the two schemes. Section 6500 et seq. govern commitments of dangerous mentally retarded persons, while the LPS Act is a comprehensive scheme for the involuntary detention, evaluation, and treatment of “mentally ill” individuals. (Conservatorship of Susan T. (1994) 8 Cal.4th 1005, 1008 [36 Cal.Rptr.2d 40, 884 P.2d 988] (Susan I).) For purposes of the LPS Act, such a mentally ill person is anyone who, “as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled.” (§ 5150; see John L., supra, 48 Cal.4th 131, 142.) Intervention occurs on a limited basis through successive statutory periods which are initially quite brief (§ 5150 [72 hours]), and which are “carefully calibrated” to increase over time. (Ben C., supra, 40 Cal.4th 529, 541; see, e.g., §§ 5250 [14 days], 5270.15 [30 days], 5300 [180 days].) The process culminates in a one-year conservatorship (§ 5361) for persons who are “gravely disabled” (§ 5350) as a result of their mental disorders. (See § 5008, subd. (h)(1) & (2) [defining “ ‘gravely disabled’ ”]; see id., subd. (h)(3) [excluding “mentally retarded persons by reason of being mentally retarded alone”].)
The term “mental disorder” is not defined in any LPS Act provision. (People v. Allen (2007) 42 Cal.4th 91, 107, fn. 7 [64 Cal.Rptr.3d 124, 164 P.3d 557].) Courts applying the LPS Act and similar commitment schemes have sought to fill this gap. Mental illness and related disorders are said to be conditions that may arise suddenly and, for the first time, in adulthood. (Heller, supra, 509 U.S. 312, 322.) The LPS Act process itself assumes that the need for treatment may be temporary, and that disabling mental disorders may be intermittent or short lived. (See Susan T, supra, 8 Cal.4th 1005, 1018 [“not every detention under section 5150 leads to a conservatorship proceeding . . .”].)
In addition, because of the complexity of human behavior, and the lack of a long history in every case, mental illness and related disorders may be *1109 difficult to diagnose. (Heller, supra, 509 U.S. 312, 322, citing Addington, supra, 441 U.S. 418, 430.) Where present, however, “ ‘mental illness “often strikes only limited areas of functioning, leaving other areas unimpaired, and consequently . . . many mentally ill persons retain the capacity to function in a competent manner.” ’ ” (In re Qawi (2004) 32 Cal.4th 1, 17 [7 Cal.Rptr.3d 780, 81 P.3d 224], italics added [addressing circumstances in which mentally disordered offenders under Pen. Code, § 2960 et seq. have qualified rights similar to some LPS Act patients to refuse antipsychotic drugs].)
These characteristics suggest that the mental conditions that create eligibility for an extended 180-day LPS Act commitment, though they include imminent dangerousness, do not necessarily imply incompetence or a reduced ability to understand, and make decisions about, the conduct of the proceedings. Hence, nothing compels the conclusion that such LPS Act patients will not benefit from the statutory right to a jury trial advisement set forth in section 5302. By contrast, in the case of persons alleged to be mentally retarded and dangerous under section 6500, the commitment process itself raises substantial doubts about their cognitive and intellectual functioning sufficient to limit the personal and procedural role they play. It follows that the two groups are not similarly situated as to the function that Barrett implies an advisement like section 5302 serves—comprehending and controlling the decision whether to request a jury trial. Thus, any disparate statutory treatment with respect to jury trial advisements does not deprive persons like Barrett of equal protection of the law.
The equal protection analysis included in both People v. Alvas, supra, 221 Cal.App.3d 1459, 1463-1464, and People v. Bailie, supra, 144 Cal.App.4th 841, 844-847, does not persuade us to reach different conclusions. In finding no valid basis for any disparate statutory treatment as to jury trial advisements, both cases simply assumed that section 6500 defendants are similarly situated with 180-day LPS Act candidates. This assumption is flawed and erroneous for reasons we have explained. Hence, both Alvas and Bailie are disapproved to the extent they conflict with the views we have expressed.
We also reject a further insinuation in Barrett’s equal protection claim. She suggests that, in not expressly authorizing jury trials or requiring jury trial advisements in section 6500 proceedings, even though several other commitment schemes include such rights, the Legislature has arbitrarily decided that alleged mentally retarded persons are unsuited to such protection, and has unfairly, subjected them to more burdensome procedures than persons facing commitment in almost any other circumstance. In essence, Barrett simply implies that if some such schemes include these provisions, then all must.
*1110 But an equal protection violation does not occur merely because different statutory procedures have been included in different civil commitment schemes. (See Hofferber, supra, 28 Cal.3d 161, 172 [Legislature “may adopt more than one procedure for isolating, treating, and restraining dangerous persons”].) Nothing compels the state “to choose between attacking every aspect of a problem or not attacking the problem at all.” (People v. Jennings (2000) 81 Cal.App.4th 1301, 1312-1313 [97 Cal.Rptr.2d 727].) Far from having to “solve all related ills at once” (People v. Cooper (1996) 43 Cal.App.4th 815, 829 [51 Cal.Rptr.2d 106]), the Legislature has “broad discretion” to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination (People v. Ward (2005) 36 Cal.4th 186, 217 [30 Cal.Rptr.3d 464, 114 P.3d 717], citing McLaughlin v. Florida (1964) 379 U.S. 184, 191 [13 L.Ed.2d 222, 85 S.Ct. 283] and Warden v. State Bar of California (1999) 21 Cal.4th 628, 649 [88 Cal.Rptr.2d 283, 982 P.2d 154]).
Contrary to what Barrett implies, she has not been singled out for harsh and unfair treatment in this regard. Of the nine commitment procedures we have listed above, a majority (including § 6500 et seq.) either do not reference jury trial matters at all (such that a right to jury trial on request has been constitutionally implied),[18] or they say nothing about advisements or waivers of any jury trial right otherwise provided therein.[19] By the same token, variations in the other commitment schemes suggest no uniform set of jury trial procedures exists or was withheld from Barrett.[20] There is nothing unusual or unconstitutional about the manner in which these statutes have evolved over time.
*1111 For all of the foregoing reasons, Barrett has not presented a meritorious equal protection challenge to the statutory jury trial procedures available under section 6500 compared to other commitment schemes. We decline to invalidate the commitment order entered after her nonjury trial on this ground.[21]
IV. DISPOSITION
The judgment of the Court of Appeal is affirmed. To the extent the analyses in People v. Alvas, supra, 221 Cal.App.3d 1459, and People v. Bailie, supra, 144 Cal.App.4th 841, are inconsistent with the views expressed herein, these decisions are disapproved.
Cantil-Sakauye, C. J., Kennard, J., Chin, J., and Corrigan, J., concurred.

 All further undesignated statutory references are to the Welfare and Institutions Code.

 Barrett suggests that “mental retardation” and closely related phrases are outmoded expressions for persons with subaverage cognitive and adaptive functioning, and that California courts should speak only in terms of persons who are “developmentally disabled" or “intellectually disabled.” A similar point is made in the lone amicus curiae brief filed in this court, which was submitted by Disability Rights California on behalf of itself and other entities and individuals. The terms “mentally retarded” and “mental retardation” appeared throughout the statutory scheme when the present commitment proceedings were held and the findings under review were made. To avoid confusion, we use such original terminology here, and cite the version of the statutory scheme applied to Barrett at all stages of the present case. Nonetheless, we are aware that legislative enactments and proposed amendments replace references to “mental retardation” under section 6500 et seq. with such terms as “developmental disability” and “intellectual disability.” (See Assem. Bill No. 1472, approved by Governor, June 27, 2012 (2011-2012 Reg. Sess.); see also Sen. Amend, to Assem. Bill No. 2370 (2011-2012 Reg. Sess.) June 20, 2012.) As suggested by both Barrett and Justice Liu’s concurring and dissenting opinion, however, nothing in this new or pending legislation appears on its face to concern either the right to jury trial or the ancillary procedures at issue here.

 The Center is one of several regional, community-based nonprofit agencies funded and regulated by the state to serve developmentally disabled persons, pursuant to the Lanterman Developmental Disabilities Services Act (LDDSA). (See § 4620; see also post, at p. 1094, fn. 10.)

 Dr. Thomas noted near the end of his direct examination that Barrett had been diagnosed over the years with various mental disorders in addition to mental retardation. They included autism, bipolar disorder, schizophrenia, and schizoaffective disorder.

 On cross-examination, Dr. Thomas acknowledged that other mental disorders besides mental retardation can trigger aggression, including autism and schizophrenia. However, in Barrett’s case, he declined to blame her violent outbursts either solely or primarily on any diagnosed mental disorder other than mental retardation. While such conditions likely interacted to affect her behavior, and it was difficult to distinguish between them in that sense, the “limited cognitive ability” associated with mental retardation played a central role in causing her dangerousness. According to Dr. Thomas, it was Barrett’s inability to understand that she was mentally disordered and needed treatment that most impaired her past progress and prognosis.

 For example, in September 2008, Barrett was “obsessing” at home about her hair color when she learned her mother would arrive soon. Barrett became upset, broke a chair and other furnishings, and was restrained by staff when she showed aggression toward her mother. Barrett then locked herself in the bathroom, but became docile when the police arrived and took her to a psychiatric unit for evaluation. Later that month, Barrett was crying in her bedroom when she suddenly emerged and punched holes in the walls. She threw a glass bowl at a window, breaking the window on the second try. Two months later, in December 2008, Barrett refused to leave home for a mental health appointment. She threatened to harm staff, destroyed property, and purposefully scratched her face to make it bleed. This episode triggered a 9-1-1 call and admission to a psychiatric unit. Finally, two incidents occurred in January 2009. First, Barrett came home upset after attending church with her parents. She assaulted staff and was hospitalized for emergency psychiatric care. Later that month, at the Center, Barrett cursed and angrily announced that she had changed her name. She threatened to harm staff with a knife, and then entered the bathroom and scratched her arm.

 The trial court scheduled a followup hearing in July 2009, to review the complex nature of Barrett’s diagnosed disorders, and to ensure the best placement and treatment options over the long term. The court contemplated that, in the ensuing three-month period, either the Center or Barrett’s treatment facility would conduct a full evaluation of her psychiatric history. No further testing was ordered. The record contains no other information about the July 2009 hearing or about any other trial court proceeding after the April 2009 commitment hearing. Indeed, we infer that the original commitment order “expire[d] automatically” by its own terms one year after it was made (§ 6500), and that it therefore is technically moot. Because the issues are of recurring importance and properly presented by the parties, we decide the case on the merits. (See, e.g., Conservatorship of John L. (2010) 48 Cal.4th 131, 142, fn. 2 [105 *1093 Cal.Rptr.3d 424, 225 P.3d 554], and cases cited (John L.); Conservatorship of Hofferber (1980) 28 Cal.3d 161, 167, fh. 2 [167 Cal.Rptr. 854, 616 P.2d 836], and cases cited (Hofferber).)

 See former section 6500.1, added by Statutes 1970, chapter 351, section 3, -page 765, and renumbered as section 6500 and amended by Statutes 1978, chapter 1319, section 2, page 4316; see also sections 6502-6512 (exclusive of § 6504.5), added by Statutes 1967, chapter 1667, section 37, page 4107, operative July 1, 1969.

 Former section 6502 stated, in pertinent part: “The following persons may request the person authorized to present allegations pursuant to Section 6500 to file a petition for commitment: [f] (a) The parent, guardian, conservator, or other person charged with the support of the mentally retarded person. H] (b) The probation officer. H) (c) The Youth Authority. (d) Any person designated for that purpose by the judge of the court. [j[] (e) The Director of Corrections. [][] (f) The regional center director or his or her designee. ['][] The request shall state the petitioner’s reasons for supposing the person to be eligible for admission thereto, and shall be verified by affidavit.”

 Under the LDDSA, regional centers consist of a network of “private nonprofit community agencies” (§ 4620, subd. (b)) with which the state, through the Department, contracts to provide lifetime support directly to developmentally disabled persons and their families. (Id., subd. (a); see § 4512, subd. (a) [defining “ ‘[developmental disability’ ” to include mental retardation].) Regional centers assess clients by reviewing their diagnostic history, and providing or procuring a wide range of tests and evaluations. (See §§ 4642, 4643.) In each case, the center establishes both a “ ‘[planning team’ ” (§ 4512, subd. (j)) and an “individual program plan” identifying goals and needs (§ 4646). A high priority is “direct service coordination” (§ 4640.6, subd. (a)), in which services are obtained from providers, vendors, and contractors. (See §§ 4640.7, 4647, 4648.) A regional center employee, or “ ‘service coordinator,’ ” prepares individual program plans, secures needed services, and provides *1095 placement and monitoring support. (§ 4640.6, subd. (d); see Morohoshi v. Pacific Home (2004) 34 Cal.4th 482, 487-488 [20 Cal.Rptr.3d 890, 100 P.3d 433].)

 Former section 6504.5 stated, in pertinent part: “Wherever a petition is filed [under section 6500 et seq.], the court shall appoint the director of a regional center for the developmentally disabled established under [section 4500 et seq.], or the designee of the director, to examine the alleged mentally retarded person, [f] Within 15 judicial days after [such] appointment, the regional center director or designee shall submit to the court in writing a report containing his or her evaluation of the . . . person. The report shall contain a recommendation of a facility or facilities in which the . . . person may be placed. [][] The report shall include a description of the least restrictive residential placement necessary to achieve the purposes of treatment. . . . [Consideration shall be given to public safety. If placement into or out of a developmental center is recommended, the regional center director or designee simultaneously shall submit the report to the executive director of the developmental center or his or her designee. The executive director ... or his or her designee may, within 15 days of receiving the regional center report, submit to the court a written report evaluating the ability of the developmental center to achieve the purposes of treatment [and] to protect the public health and safety from ... the person’s known behaviors, [f] The [foregoing] reports . . '. shall also address suitable interim placements . . . [under] Section 6506.”

 Former section 6500 stated, in pertinent part: “In any proceedings conducted under the authority of [section 6500 et seq.], the alleged mentally retarded person shall be informed of his or her right to counsel by the court, and if the person does not have an attorney for the proceedings, the court shall immediately appoint the public defender or other attorney to represent him or her.”

 See, e.g., the Sixth Amendment to the United States Constitution (“In all criminal prosecutions, the accused shall enjoy the right to ... an impartial jury ... .”); article I, section 16 of the California Constitution (“Trial by jury is an inviolate right and shall be secured to all, but in a civil cause three-fourths of the jury may render a verdict. A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant’s counsel. In a civil cause a jury may be waived by the consent of the parties expressed as prescribed by statute.”).

 See People v. Wilkinson (2010) 185 Cal.App.4th 543, 547 [110 Cal.Rptr.3d 776]; People v. Sweeney (2009) 175 Cal.App.4th 210, 217-218 [95 Cal.Rptr.3d 557]; Bailie, supra, 144 Cal.App.4th 841, 844-847; Alvas, supra, 221 Cal.App.3d 1459, 1462-1463; Money v. Krall (1982) 128 Cal.App.3d 378, 398 [180 Cal.Rptr. 376] (Money); In re Watson (1979) 91 Cal.App.3d 455, 459-460 [154 Cal.Rptr. 151]; see also In re Hop (1981) 29 Cal.3d 82, 92-93 [171 Cal.Rptr. 721, 623 P.2d 282] (Hop) (holding that developmentally disabled adults who are incapable of protesting or consenting to hospitalization by third parties under § 4825, and who have no statutory hearing rights upon admission, have equal protection hearing rights that include “jury trial on demand,” consistent with jury trial statutes in other commitment schemes); see Hop at pp. 93-94 (noting that similar constitutional jury trial rule applies in § 6500 proceedings under O’Brien v. Superior Court, supra, 61 Cal.App.3d 62, 68-69); In re Gary W. (1971) 5 Cal.3d 296, 303-308 [96 Cal.Rptr. 1, 486 P.2d 1201] (Gary W.) (same equal protection rule as to dangerously disturbed persons held for treatment upon discharge from juvenile system under § 1800 et seq., and who had no statutory jury trial right at the time).

 Code of Civil Procedure section 631, subdivision (a) states: “The right to a trial by jury as declared by Section 16 of Article I of the California Constitution shall be preserved to the parties inviolate. In civil cases, a jury may only be waived pursuant to subdivision (f).” Under subdivision (f) of the same section, “[a] party waives trial by jury in any of the following ways: Q] (1) By failing to appear at the trial, [f] (2) By written consent filed with the clerk or judge. HQ (3) By oral consent, in open court, entered in the minutes. H] (4) By failing to announce that a jury is required, at the time the cause is first set for trial, if it is set upon notice or stipulation, or within five days after notice of setting if it is set without notice or stipulation. [][] (5) By failing to deposit with the clerk, or judge, advance jury fees as provided in subdivision (c) or (d), as applicable, [f] (6) By failing to deposit with the clerk or judge, at the beginning of the second and each succeeding day’s session, the sum provided in subdivision (e).” (Code Civ. Proc., § 631, subd. (f), italics added.)

 At one point, Masterson, supra, 8 Cal.4th 965, 972, linked its assumptions about a criminal defendant’s limited capacity to play a personal role in the competence hearing to what prior cases had called a “ ‘prima facie showing’ ” of incompetence. More accurately, the Legislature contemplates that, in the underlying criminal case, the trial court has entertained a “doubt” on competence (Pen. Code, § 1368, subd. (a)) and/or counsel has expressed a similar “belie[f|” (id.., subd. (b)). Because due process bars any criminal defendant from being tried while mentally unsound, a competence hearing is required if “substantial evidence” raises a “ ‘reasonable doubt’ ” on the issue. (People v. Lawley (2002) 27 Cal.4th 102, 131 [115 Cal.Rptr.2d 614, 38 P.3d 461], and cases cited.) Of course, different procedures and formalities accompany a section 6500 matter, which does not necessarily arise out of, or have any connection to, a criminal case. This does not mean, however, that before any section 6500 trial, no substantial doubts have been raised about the person’s cognitive condition, or that no *1103 evidentiary support for the allegations of mental retardation exists. As we shall explain, a section 6500 proceeding begins, and commitment and placement hearings occur, based on verified information and mental evaluations from interested and informed parties.

 Section 5302 states: “At the time of filing a petition for postcertification treatment the court shall advise the person named in the petition of his right to be represented by an attorney and of his right to demand a jury trial. The court shall assist him in finding an attorney, or, if need be, appoint an attorney if the person is unable to obtain counsel. The court shall appoint the public defender or other attorney to represent the person named in the petition if the person is financially unable to provide his own attorney. The attorney shall advise the person of his rights in relation to the proceeding and shall represent him before the court.”

 See section 4825, added by Statutes 1977, chapter 1252, section 550, pages 4520, 4564, operative July 1, 1978; see also Hop, supra, 29 Cal.3d 82, 92-94.

 For example, in proceedings to commit narcotic addicts, whether they have been convicted of crimes (see § 3050 et seq.) or not convicted of crimes (see § 3100 et seq.), section 3108 contemplates a “written demand” to be “tried by a jury” under civil law, and a verdict “by at least three-fourths of the jury.” (§ 3108, as amended by Stats. 1967, ch. 1124, § 13, p. 2790); but see People v. Thomas (1977) 19 Cal.3d 630, 641, 644 [139 Cal.Rptr. 594, 566 P.2d 228] [holding that due process requires proof beyond a reasonable doubt and unanimous verdicts in § 3108 jury trials].) Another approach to the basic jury trial right is used to civilly commit sexually violent predators. (See § 6600 et seq.) Since that scheme’s enactment in 1995, section 6603 has stated that the defendant is “entitled to a trial by jury” (§ 6603, subd. (a)), and that the “attorney petitioning for commitment” also has “the right to demand that the trial be before a jury” (id., subd. (b); see id., subd. (e) [if neither party demands a jury trial, “the trial shall be before the court without a jury”]). Elsewhere, in proceedings to determine the mental competence of criminal defendants, Penal Code section 1369 simply authorizes a “trial by court or jury,” and regulates the content and chronology of such trials. (See Pen. Code, former § 1369, as amended by Stats. 1974, ch. 1511, § 5, p. 3318, eff. Sept. 27, 1974.)

 See sections 1801.5 (contemplating jury trials in proceedings under § 1800 et seq. to detain disordered and dangerous persons upon discharge from the juvenile system, unless the right to jury trial is personally waived by the person, after being fully advised of the waived *1111 rights, and by the prosecuting attorney), 5302 (requiring that in LPS Act proceedings to extend custodial treatment to 180 days for imminently dangerous and disordered persons, the court must advise the person of the right to demand a jury trial); Penal Code section 1026.5, subdivision (b)(3), (4) (providing that in proceedings to extend commitment and treatment of disordered and dangerous persons found not guilty by reason of insanity in felony cases, the court must advise the person of the right to jury trial, and that any waiver must be by both the person and the prosecuting attorney); Penal Code section 2972, subdivisions (a) and (e) (establishing that in proceedings to continue commitment and treatment of mentally disordered and dangerous prisoners, the court must advise the person of the right to jury trial, and that any waiver must be by both the person and the district attorney).

 In separate concurring and dissenting opinions, Justices Liu and Werdegar likewise approve the commitment order, but only after crafting their own constitutional theory of equal protection—a theory which contravenes settled law and undercuts the Legislature’s decision not to require jury trial advisements in section 6500 proceedings. Justices Liu and Werdegar are aware that we have correctly applied the United States Supreme Court’s prevailing “rational basis” standard for analyzing the equal protection claims of mentally retarded persons. (Heller, supra, 509 U.S. 312, 319-321.) Nonetheless, though Justice Liu argues otherwise, he and Justice Werdegar use the jury trial advisement statutorily available to certain mentally ill patients facing extended 180-day commitments under the LPS Act (see § 5302) to create a new state constitutional jury trial advisement right for mentally retarded persons. Their reason for invoking the state charter is to import federal authority that is outmoded in this context (Cleburne v. Cleburne Living Center, Inc. (1985) 473 U.S. 432 [87 L.Ed.2d 313, 105 S.Ct. 3249]), and to thereby find an equal protection violation under an unduly strict standard of scrutiny. (See id. at pp. 448, 450.) The standard they propose was, of course, superseded, and essentially discarded, in Heller, supra, 509 U.S. at page 321. Ironically, the views set forth at length in the concurring and dissenting opinions result in little real-world benefit to Barrett, and, as Justice Liu appears to concede, the right to a jury trial advisement for which he and Justice Werdegar advocate is largely symbolic. Their analyses include the concession, either express or implicit, that Barrett was not necessarily entitled to act on such a direct advisement by personally deciding whether to demand a jury. Moreover, they conclude that to the extent Barrett received no such advisement, no prejudice occurred in light of undisputed evidence that she was both mentally retarded and dangerous. In sum, we find the concurring and dissenting opinions unpersuasive, and we decline to adopt their views or to modify our approach.