Filed 6/7/13  P. v. Gonzalez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037267 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC9945524) |
| v. | |
| ALEJANDRO MUNOS GONZALEZ, | |
| Defendant and Appellant. | |

## I. STATEMENT OF THE CASE

In 2000, after a bench trial, the court found defendant Alejandro Munos Gonzalez not guilty by reason of insanity (NGI) of arson and assault and battery and committed him to the Department of Mental Health (Department) for treatment at Atascadero State Hospital (ASH).  (Pen. Code, §§ 451, subd. (d), 242, 243, subd. (a), 1026.5, subd. (a).)[1] Defendant appeals from an order extending his commitment until September 9, 2013.  He claims the court erred in failing to advise him of his right to a jury trial, failing to obtain his personal waiver, accepting counsel's jury waiver, and conducting a bench trial.

We affirm the order.

---

[1]  "Technically, once a defendant has been found not guilty by reason of insanity, he is no longer a criminal defendant, but a person subject to civil commitment."  (*People v. Lara* (2010) 48 Cal.4th 216, 222, fn. 5.)  We shall refer to such persons as defendants or NGIs rather than "committees" or "persons committed."

All unspecified statutory references are to the Penal Code.

## II. BACKGROUND AND PROCEDURAL HISTORY

On September 2, 1999, defendant poured gasoline on a neighbor's boat and set it on fire. On September 17, he assaulted his mother. On September 19, he threatened to kill his sister. According to defendant, he heard voices before these incidents challenging and daring him to do something. As noted, he was found NGI and committed to ASH.

In 2003, the Santa Clara Count District Attorney (the District Attorney) sought to extend defendant's NGI commitment. However, on March 12, 2003 before an extension hearing, defendant was released on outpatient status to Harper Medical Group (Harper) under the South Bay Conditional Release Program (CONREP). Four days later, Harper asked the court to recommit defendant because he was exhibiting bizarre behavior, and shortly thereafter, the court ordered him to Napa State Hospital (NSH) for continued treatment. Thereafter, defendant waived his rights to a trial on the petition and agreed to an extension of his commitment until March 14, 2005.

In 2004, before the commitment expired, defendant sought release on the ground that his sanity had been restored. (§ 1026.2.) The court ordered NSH to evaluate defendant. During this time, the District Attorney sought another extension of the commitment to March 2007. After evaluating defendant, NSH recommended that his commitment be extended again. In April 2005, the court held a jury trial on the petition, but the jury was unable to reach a verdict, and the court declared a mistrial. The matter was not retried because defendant agreed to the extension on condition that he be released on outpatient status.

Thereafter, defendant was placed in a transitional residence for CONREP clients called Northstar. In August, 2005, he "decompensated," and the court ordered a temporary commitment to NSH. In February 2006, Harper recommended that he be returned to Harper, and in March 2006, defendant's outpatient status was reinstated. However, defendant again quickly decompensated, becoming delusional, paranoid, violent, intimidating, verbally abusive, and threatening. In April 2006, he was

2

temporarily recommitted to NSH to restabilize.  He responded to treatment, and in July 2006, he regained outpatient status.

In a report dated August 2006, CONREP advised the court that defendant was stable, controlling his behavior, and motivated to return to the community.  He also understood the need to deal with his psychiatric problems without resorting to threats and intimidation.  In November 2006, the court revoked defendant's outpatient status and recommitted him to NSH because he had verbally abused and threatened staff and had pretended to start a fire.

Defendant's commitment under the court's previous order expired on March 14, 2007.  On March 22, the court, after a hearing, reconfirmed the previous revocation of defendant's outpatient status.  In June 2007, defendant petitioned for a writ of habeas corpus alleging the wrongful denial of "dignity, respect, and humane care."  The District Attorney sought another extension.  In August, the court denied defendant's habeas petition.  In October 2007, counsel submitted the determination of the extension petition on the latest psychological evaluation by NSH.  Based on that report, the court extended defendant's commitment to September 9, 2009.

In January 2009, defendant filed another habeas petition.  In March 2009, he also sought a determination that his sanity had been restored.  At that time, the District Attorney sought another extension.  On August 26, 2009, defendant personally waived all of his rights and admitted that he posed a danger to others if released, and the court extended his commitment until September 9, 2011.

One year later, on September 17, 2010, defendant sought release on outpatient status to CONREP but later withdrew his request.  It appears that he renewed it in February 2011.  In April 2011, the District Attorney again sought another extension.  On April 28, 2011, the court denied defendant's request for release.  On June 24, 2011, counsel waived a jury trial on the extension petition, and on August 4, 2011, the court

3

granted the petition and extended defendant's commitment to September 9, 2013. As noted, defendant appeals from that order.

### III. THE EXTENSION HEARING

Dr. James Eyerman, M.D., a psychiatrist at NSH, testified as an expert in the diagnosis and treatment of mental disorders and risk assessment. He had been defendant's treating psychiatrist since November 2010. He testified that defendant suffered from schizo-affective disorder that caused him to have difficulty controlling his dangerous behavior. He also had problems with auditory hallucinations both before and after the commitment offense in 1999. Although treatment with medication had helped control certain extreme manifestations of defendant's disorder, lesser manifestations, including rapid mood swings, delusions, and hyper-religiosity, persisted. Although defendant could be pleasant, at other times he was irritable, argumentative, and perhaps threatening. These were the primary reasons his previous releases to CONREP were revoked. Although defendant understood the need to continue taking medication, Dr. Eyerman was not sure how long defendant would do so without some supervision. He noted studies revealing that a high percentage of persons stop taking their medication after being released from supervision.

Dr. Eyerman commended defendant for acknowledging that he had a mental disorder, understanding the connection between his disorder and his commitment offense, and learning to recognize the warning signs of his disorder, including mood swings. However, he noted that defendant did not recognize warning signs before becoming upset or while he was upset. He had been working on a relapse prevention plan and had identified his impulsivity and anger as risk factors. He had also worked on strategies to help him recognize these factors so that he would not become aggressive and threatening. Although at times, defendant had not acted impulsively when he had gotten angry, he had not been able to consistently restrain his impulsivity. Dr. Eyerman noted that within the previous 10 months, defendant had been verbally aggressive and threatening to a female

4

staff member. Moreover, defendant initially felt that his hostility was justified. Only later did he acknowledge that his actions had been improper.

Defendant had manifested his mood swings in a pushing incident and in threats of self harm, although Dr. Eyerman opined that those incidents might have been caused in part by a chemical imbalance related to the mood stabilizing medication defendant had been taking. For that reason, his staff began to monitor defendant's chemical levels regularly especially when he seemed particularly irritable. Dr. Eyerman also noted that defendant had in the past year been placed on "continuous insight observation"—i.e., one-on-one staffing—after an incident in which he "pinned a staff member against a wall." He noted some other incidents in which defendant tried to strip a staff member or became hostile toward one staff member and verbally abusive. He later filed a complaint against the latter demanding that she stop some unspecified conduct "before I take things the wrong way and she ends up on the floor."

In all, Dr. Eyerman opined that defendant still had some difficulty with mood swings and irritability. Defendant had done well for the last few months, but Dr. Eyerman did not find him ready for release even to CONREP on outpatient status. He opined that defendant should first demonstrate that he can maintain his behavior for six months in his highly supervised and structured locked unit, thereafter in an open unit placement, and then on outpatient status before being unconditionally released. Dr. Eyerman noted that defendant still had a few months to go before he could become eligible for an open unit.

Defendant acknowledged that he had a mental disorder and will need treatment and medication for the rest of his life. He said he intended to continue taking medication because without it he cannot act properly. He said that the medication helped him channel his energy in a positive way, and he would continue to take it even without supervision. He pointed out that he has been avidly participating in numerous groups and

5

programs, including therapy, AA, NA, sports, relapse prevention, and anger management. As a result, he had learned tools to help him cope with aggressive and obnoxious people.

Defendant acknowledged an incident with a female staff member, although he denied pinning her against the wall and said he only pushed her. He could not recall any of the other incidents mentioned by Dr. Eyerman. Defendant acknowledged his previous unsuccessful releases on outpatient status. However, he said that now he would handle himself differently.

## IV. AN NGI COMMITMENT AND EXTENSION

Under the statutory scheme for NGI commitments, a defendant who has been committed to a state hospital after being found NGI may not be kept in actual custody longer than the maximum state prison term to which he or she could have been sentenced for the underlying offense. (§ 1026.5, subd. (a)(1).) At the end of that period, the district attorney can seek a two-year extension by filing a petition alleging that the defendant presents a substantial danger of physical harm to others because of his or her mental disease, defect, or disorder. (§ 1026.5, subds. (b)(1)-(2).) At that time, the court is required to "advise the person named in the petition . . . of the right to a jury trial" (§ 1026.5, subd. (b)(3)) and conduct a jury trial "unless waived by both the person and the prosecuting attorney" (§ 1026.5, subd. (b)(4)). The person is "entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings," and all proceedings must "be in accordance with applicable constitutional guarantees." (§ 1026.5, subd. (b)(7).)[2]

---

[2] Section 1026.5, subdivision (b)(3) provides: "When the petition is filed, the court shall advise the person named in the petition of the right to be represented by an attorney and of the right to a jury trial. The rules of discovery in criminal cases shall apply. If the person is being treated in a state hospital when the petition is filed, the court shall notify the community program director of the petition and the hearing date.

Section 1026.5, subdivision (b)(4) provides: "The court shall conduct a hearing on the petition for extended commitment. The trial shall be by jury unless waived by both the person and the prosecuting attorney. The trial shall commence no later than 30

## V. CONTENTS

Defendant contends that the court committed reversible error in failing to give the required advisement and conducting a bench trial without obtaining his personal waiver. He argues that a competent NGI is entitled to decide whether to have a jury trial and therefore, under section 1026.5, the court must conduct a jury trial unless the jury is waived either personally by the NGI or by counsel at the NGI's direction or with his or her knowledge and consent. Citing *People v. Powell* (2004) 114 Cal.App.4th 1153, (*Powell*), the Attorney General argues that defendant's personal waiver is not required because counsel has exclusive control over whether to have a jury trial.

## VI. DISCUSSION

Recently, in *People v. Tran* (2013) 216 Cal.App.4th 102 (*Tran*), this court rejected the Attorney General's claim that under section 1026.5, counsel, not the NGI, controls the decision of whether to waive a jury trial. Rather, we concluded that under the statute, a competent defendant is entitled to decide whether to waive a jury trial and may do so personally or through counsel; however, when the defendant is not sufficiently competent to make the decision, he or she must act through counsel, and counsel may waive a jury even over the defendant's objection.

We noted that the statutory language pertinent language in the waiver provision— "unless waived by both the person and the prosecuting attorney"—does not confer exclusive control on counsel; nor does it expressly or implicitly bar NGIs from controlling the decision. We further observed that when read together, the advisement

---

calendar days prior to the time the person would otherwise have been released, unless that time is waived by the person or unless good cause is shown.

Section 1026.5, subdivision (b)(7) provides, in relevant part: "The person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings. All proceedings shall be in accordance with applicable constitutional guarantees. The state shall be represented by the district attorney who shall notify the Attorney General in writing that a case has been referred under this section. If the person is indigent, the county public defender or State Public Defender shall be appointed."

and waiver provisions do not reflect a legislative intent to confer such exclusive control. Rather, in requiring that the court advise "the person named in the petition" and conduct a jury trial unless waived by "the person," the statute contemplates that NGIs can make the decision and expressly provides for them to do so. (*Tran, supra,* 216 Cal.App.4th at p. 125.)

We further reasoned, "that if the Legislature had intended to give counsel exclusive control, it could have done so easily and clearly by requiring a jury trial unless waived by 'the person's *attorney*' just as it specified a waiver by the district *attorney*.' (Cf. § 2966, subd. (b) [requiring hearing within specified time unless waived by 'petitioner or his or her counsel'].) Conversely, we doubt the Legislature would have clouded such an intent by requiring the court to advise 'the person' and further requiring a jury trial unless waived by 'the person.' " (*Tran, supra,* 216 Cal.App.4th at p. 125.) We also presumed that the Legislature intended the advisement to perform a meaningful and useful function, and noted that if the statute gave counsel exclusive authority, an advisement would serve no meaningful function, and there would have been no need to make it mandatory. (*Ibid.*)

We acknowledged that in *People v. Masterson* (1994) 8 Cal.4th 965, 974 (*Masterson*), the Supreme Court concluded that in a collateral proceeding to determine the competency of a criminal defendant to stand trial, counsel had exclusive control over the whether to request a jury and may decline to do so over the defendant's objection. (*Id.* at pp. 971, 973; see § 1368.) We pointed out that the court's conclusion rested on both the specific nature of a competency proceeding, where the defendant necessarily plays a lesser role. The court's conclusion also reflected the view that when a defendant's competency is called into question and must be determined, the defendant is assumed to be unable to act in his or her own best interests and must therefore act through counsel. (*Tran, supra,* 216 Cal.App.4th at p. 127.)

8

We noted that more recently in *People v. Barrett* (2012) 54 Cal.4th 1081 (*Barrett*), the court similarly recognized counsel exclusive authority in proceedings under Welfare and Institutions Code § 6500 to involuntarily commit developmentally or intellectually disabled persons who pose a danger to others. (*Id.* at pp. 1104-1105.) There too counsel's exclusive authority derived from the nature of the proceedings. The court explained that the statute applies to persons who have significant cognitive and intellectual deficits that never recede and affect the ability to make basic decisions about the conduct of the proceedings. In other words, it may be assumed that they are unable to act in their own best interests and must act through counsel. (*Id.* at pp. 1103-1104.)

As we explained in *Tran*, *Masterson* and *Barrett* establish that in certain types of commitment proceedings, the defendant's alleged mental state—e.g., incompetency and developmental or intellectual disability—renders the defendant unable to make reasoned decisions concerning whether to have a jury trial. In other words, it is reasonable to categorically assume that such defendants lack the capacity to make a rational choice. "For that reason, they must act through counsel, and counsel has exclusive control over the jury issue." (*Tran, supra,* 216 Cal.App.4th at p. 129.)

Turning to the NGI context, we found it unreasonable to similarly assume that *all* NGIs lack the capacity to make a rational decision about whether to have a jury trial. (*Tran, supra,* 216 Cal.App.4th at p. 131.) In this regard, we relied on *Barrett*, where the court carefully distinguished persons who have developmental and intellectual disabilities from persons who suffer from a mental disorder, disease, or defect concerning their capacity to function in a competent manner and, more specifically, comprehend and control the jury decision. The *Barrett* court concluded that unlike persons with developmental and intellectual disabilities, many mentally ill persons retain the capacity to function in a competent manner, and therefore, their illness does not necessarily imply incompetence or a reduced ability to understand and make decisions about the conduct of the proceedings against them, such as comprehending an advisement and controlling the

9

decision to request or waive a jury trial. (*Barrett, supra*, 54 Cal.4th at pp. 1108-1109; *Tran, supra,* 216 Cal.App.4th at p. 132.)

We found the Attorney General's reliance on *Powell* to support to establish counsel's exclusive authority to be misplaced. We noted that in *Powell*, counsel waived a jury, but the defendant objected to counsel's waiver and requested a jury. At that time, however, the defendant was medicated and experiencing mood swings, and when the court denied the request, the defendant became so argumentative, belligerent, and disruptive that he had to be removed from the courtroom. In upholding counsel's waiver, the court found that the defendant was not competent to waive jury at the extension trial, and therefore, counsel was authorized to do so on his behalf. (*Powell, supra*, 114 Cal.App.4th at pp. 1157-1158; *Tran, supra,* 216 Cal.App.4th at p. 131.) Thus, as we pointed out in *Tran*, *Powell* was consistent with—indeed it mirrored—the *Masterson-Barrett* rationale for recognizing counsel's exclusive control over the jury issue. (*Ibid*.)

The issue before us now, however, is whether the court committed reversible error. The propriety of the bench trial turned on the validity of counsel's waiver, which, in turn, hinged on whether the defendant knew he had the right to a jury trial and directed or knowingly consented to counsel's waiver.

As defendant correctly notes, the record does not reflect that the court gave the required advisement. This is understandable because counsel waived defendant's at the pretrial hearing on June 24, 2011, at which time counsel waived a jury trial. However, it is beyond dispute that counsel was aware of defendant's right to a jury trial. And where, as here, counsel waives an MDO's presence at pretrial hearings, the court may reasonably expect counsel to discuss all pertinent matters that will arise or that have arisen in pretrial hearings, including the right to a jury trial and whether to have one. Indeed, "[l]ike all lawyers, the court-appointed attorney is obligated to keep her client fully informed about the proceedings at hand, *to advise the client of his rights*, and to vigorously advocate on his behalf. [Citations.] The attorney must also refrain from any act or representation that

10

misleads the court. (Bus. & Prof.Code, § 6068, subd. (d); Rules Prof. Conduct, rule 5–200(B).)" (*In re Conservatorship of Person of John L.* (2010) 48 Cal.4th at 131, 151-152, italics added.) Moreover, absent a showing to the contrary, "[a] reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; *Conservatorship of Ivey* (1986) 186 Cal.App.3d 1559, 1566; e.g., *Conservatorship of Mary K.* (1991) 234 Cal.App.3d 265, 272 [where no evidence to the contrary, court may presume counsel discussed jury waiver with client before waiving on client's behalf].)

Under the circumstances and in the absence of evidence to the contrary, we may presume that counsel discussed the jury issue with defendant. Moreover, the record does not suggest that defendant was unaware of his right to a jury trial. On the contrary, as noted, this was not the first extension of defendant's commitment, and he actually had a jury trial on an extension in April 2005. When the court declared a mistrial, defendant waived his rights and agreed to an extension in exchange for release on outpatient status.

The record also does not suggest that defendant was unaware that counsel intended to waive a jury and had done so or that counsel acted without defendant's knowledge or consent or that defendant wanted a jury trial and objected (or would have objected) to counsel's waiver. Any such inferences would be pure speculation on our part.[3]

It is settled that on appeal, the appellant bears the burden to affirmatively establish error and then demonstrate that it resulted in a miscarriage of justice that requires reversal. (*Cucinella v. Weston Biscuit Co.* (1954) 42 Cal.2d 71, 82; *Freeman v. Sullivant*

---

[3] If, in fact, defendant was unaware of his right to a jury trial and would have opposed or did oppose counsel's waiver, but the evidence to establish these facts lay outside the record on appeal, defendant had the alternative a remedy of habeas corpus to challenge his commitment on the ground of ineffective assistance of counsel. (See *People v. Gray* (2005) 37 Cal.4th 168, 211 [claims grounded in facts outside the record can be raised by habeas petition]; *In re Bower* (1985) 38 Cal.3d 865, 872.)

(2011) 192 Cal.App.4th 523, 528; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105-106; *Thompson v. Thames* (1997) 57 Cal.App.4th 1296, 1308; see 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 355, p. 409 [presumption of correctness; "error must be affirmatively shown"].)

In short, given the record before us, defendant cannot satisfy his burden to establish that he was unaware of the right to a jury trial before counsel waived a jury or that counsel's waiver was invalid.

Furthermore, before any judgment can be reversed for error under state law, it must appear that the error complained of "has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801.) This means that reversal is justified "when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Here, Dr. Eyerman testified as an expert in diagnosis of mental disorders and risk assessment. He was also defendant's treating psychiatrist. He testified that defendant suffered from schizo-affective disorder that caused him to have difficulty controlling his dangerous behavior. Although his medication controlled the extreme manifestations of his disorder, less extreme manifestations, including rapid mood swings, delusions, and hyper-religiosity, persisted, at times, defendant because irritable, argumentative, and perhaps threatening to others. Moreover, Dr. Eyerman could not conclude with that defendant would continue to take his medication if unconditionally released without any supervision.

Dr. Eyerman opined that defendant was not fully able to consistently implement the strategies that help him recognize the triggers and warning signs of potential aggression and threatening behavior either before becoming upset or while in such a state. He noted a number of incidents within the past year in which defendant had been

12

aggressive and threatening to others and had sent a note that arguably contained a threatening comment.

In all, Dr. Eyerman opined that defendant had made commendable progress. Nevertheless, he currently posed a risk of harm to others if unconditionally released. He recommended that defendant's commitment be extended so that defendant could establish eligibility for placement in an open unit and then for outpatient status. In this regard, we note that defendant's previous releases on outpatient status had been short lived and resulted in his recommitment.

Defendant acknowledged his mental illness and the need to take medication for the rest of his life and said he intended to do so even without supervision because it helped him act properly. Through the various programs he had participated in, he had learned how to channel his energy and cope with obnoxious and aggressive people. And although he had failed to maintain stability when previously released on outpatient status, he asserted that he would now handle himself differently.

Defendant does not suggest that Dr. Eyerman's informed opinion does not constitute substantial evidence supporting the extension order. Nor does his own testimony impeach or substantially undermine Dr. Eyerman's opinion and the bases for it. Finally, defendant's previous record of failure on outpatient status provides compelling cause to be concerned about his ability to maintain the ability to control the manifestations of his disorder if unconditionally released without any supervision.

Given the record before us, and even assuming that defendant was unaware of his right to a jury trial, we do not find it reasonably probable that defendant would have obtained a more favorable verdict had the court given the required advisement and conducted a jury trial. (*People v. Watson, supra,* 46 Cal.2d at p. 836; e.g., *People v.*

*Cosgrove* (2002) 100 Cal.App.4th 1266, 1276 [denial of statutory right to MDO trial harmless].)[4]

## VI. DISPOSITION

The order extending defendant's commitment is affirmed.

_____
RUSHING, P.J.

I CONCUR:

_____
PREMO, J.

---

[4] Defendant claims that the federal due process clause guaranteed him the right to a jury trial on the petition to extend his NGI commitment. However, the courts in *Powell, supra*, 114 Cal.App.4th at page 1159, and *Montoya, supra*, 86 Cal.App.4th at pages 831-832 rejected claims that a jury trial guaranteed by the due process clause. Moreover, in *People v. Fuquay* (2013) 215 Cal.App.4th 883, this court agreed with *Powell* and *Montoya*.

14

ELIA, J., Concurring

I respectfully concur in the judgment on the ground that no reversible error has been shown. (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.) We must presume for purposes of this appeal that appellant's counsel informed appellant that he was entitled to be tried by a jury and counsel waived a jury trial in accordance with appellant's informed consent (see maj. opn., *ante*, p. 4). (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [all presumptions are indulged to support a lower court judgment or order regarding matters as to which the record is silent; error must be affirmatively shown]; see also *Conservatorship of John L.* (2010) 48 Cal.4th 131, 148 ["When a statutory right in a civil commitment scheme is at issue, the proposed conservatee may waive the right through counsel if no statutory prohibition exists. [Citations.]"], 151-152 [attorney is obligated to keep client fully informed of proceedings, to advise client of his rights, and to refrain from any act or representation that misleads the court].)

Even assuming arguendo that appellant had a constitutional right to a jury trial as a matter of due process, the same presumption regarding waiver applies on appeal. (See *Denham v. Superior Court*, *supra*, 2 Cal.3d at p. 564; *Conservatorship of John L.*, *supra*, 48 Cal.4th at pp. 151-152.) To the extent appellant is arguing that he had concomitant due process rights, under either the United States or California Constitution, to a judicial advisement of his right to a jury trial and to personally waive a jury on the record, his arguments are unpersuasive since he was represented by counsel who presumably advised and consulted with him and there is no constitutional provision explicitly requiring an express, personal waiver of a jury in noncriminal proceedings. (See Cal. Const., art. I, § 16; cf. Code Civ. Proc., § 631; *People v. Bradford* (1997) 14 Cal.4th 1005, 1052-1053 [in criminal prosecution, no express, personal waiver from a defendant is required for waiver of constitutional right to testify; a trial judge may safely assume that a nontestifying defendant is abiding by his counsel's trial strategy].)

Consequently, it is unnecessary in this case to repeat the majority's conclusions in *People v. Tran* (2013) \_\_\_ Cal.App.4th \_\_\_ [2013 WL 1881050] regarding the exact extent of a counsel's authority to waive a jury for trial on a petition for extended commitment pursuant to Penal Code section 1026.5.  As the United States Supreme Court stated:  "The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."  (*Mills v. Green* (1895) 159 U.S. 651, 653 [16 S.Ct. 132]; see *Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541.)


_____

ELIA, J.

2