Filed 9/12/13  P. v. Shelton CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>SCOTT PATRICK SHELTON,<br><br>　　　Defendant and Appellant. | A137532<br><br>(Sonoma County<br>Super. Ct. No. SCR-450976) |

Appellant Scott Patrick Shelton was previously found not guilty by reason of insanity.  He appeals an order imposing a two-year extension of his commitment to Napa State Hospital (NSH) pursuant to Penal Code section 1026.5, subdivision (b).[1]  Shelton contends that his defense counsel's waiver of jury trial on the extension petition was invalid.  We affirm.

## I.　FACTUAL AND PROCEDURAL BACKGROUND

On December 23, 2004, Shelton entered a plea of not guilty by reason of insanity (NGI) to two counts of assault on a peace officer.  Pursuant to section 1026, he was committed to NSH for a maximum term of six years four months with credit for time served.

On August 26, 2010, the People petitioned to extend Shelton's commitment pursuant to section 1026.5, subdivision (b).  Following defense counsel's waiver of a jury

_____

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

1

trial on the petition, over Shelton's objection, the court found the People's extension petition had been proved beyond a reasonable doubt, and ordered Shelton's commitment extended until February 7, 2013. We affirmed that extension order in an unpublished opinion. (*People v. Shelton* (Oct. 19, 2011, A130923) [nonpub. opn.].)

On July 18, 2012, the People again petitioned to extend Shelton's commitment pursuant to section 1026.5, subdivision (b). Defense counsel again waived, over Shelton's objection, a jury trial. At the outset of Shelton's extension proceedings, the following colloquy occurred:

"THE COURT: . . . He's willing to waive jury and have this as a court trial.

"[DEFENSE COUNSEL]: I'm willing to waive jury on his behalf.

"THE COURT: On his behalf.

"THE DEFENDANT: Sir.

"THE COURT: Is that correct?

"[DEFENSE COUNSEL]: Yes.

"THE COURT: And the People willing to waive jury?

"[PROSECUTOR]: Yes.

"THE DEFENDANT: No, sir. I would like to be able to have a jury. Last time I was in court, I didn't have a jury. I appreciate if I can disbar—not disbar, but dismiss my lawyer, if she's recommending that I don't have a . . . jury trial, because I like to have one.

"THE COURT: Okay. Have you met and discussed the various aspects of this case with him?

"[DEFENSE COUNSEL]: I've actually represented Mr. Shelton on a number of occasions, including attempted jury trial about four years back.

"Based upon his report from [NSH], I had the right to and power to waive jury over his objection.

"THE COURT: You feel it's in his best interests to do that?

"[DEFENSE COUNSEL]: Well, I think, yes, everybody's best interests."

A court trial was held.

A June 11, 2012 extension report by NSH psychologist Benjamin Rose opined that Shelton should be considered for an extension of his NSH commitment because "he has a severe mental illness [and] continues to represent a substantial danger to others." The report stated that Shelton had been diagnosed with schizoaffective disorder, bipolar type; amphetamine dependence; and antisocial personality disorder. Shelton's schizoaffective disorder is manifested by a history of hallucinations and mood cycling. His methamphetamine dependence is manifested by an extensive history of methamphetamine abuse since adolescence. His antisocial personality disorder is manifested by "a pervasive pattern of disregard for and violation of the rights of others" and a history of arson.

In concluding that Shelton has severe mental illness and continues to represent a substantial danger to others, the extension report noted that he "has a history of violence and is refusing many aspects of treatment. He has had many episodes of verbal aggression, and at times physical aggression, in the past year." Specifically, the following aggressive acts, among others, were noted: (1) On January 4, 2011, Shelton spit on his peers; (2) On July 14, 2011, Shelton verbally threatened staff members when he believed they were putting hair in his food. When NSH police intervened, Shelton swung his fist at a staff member; (3) On December 26, 2011, Shelton refused his medication after cursing, threatening, and pacing the hallway; (4) On January 30, 2012, Shelton punched another individual in the head; (5) On May 15, 2012, Shelton told a nurse, "I'm going to kill you mother fucker," as he raised a clenched fist; (6) On May 26, 2012, Shelton received several stitches after fighting with a peer; (7) On July 24, 2012, Shelton refused medication and threw punches at staff.

A conditional release program hospital liaison report observed that Shelton was not attending group treatment and had also been found to be making a homemade wine, called "pruno." It was also noted that, on August 2, 2012, " '[Shelton] became loud, demanding for coffee, started posturing, then grabbed staff eyeglasses and tore [them] apart with his hands . . . he began urinating on the walls stating "fuck you all." ' " The

3

report concluded: "Shelton is seemingly unamenable to treatment at NSH, flagrantly violates rules, and demonstrates a consistent disregard for others . . . ."

Shelton testified that the allegations of aggression were untrue. He explained: "I'm an animated person, they misperceive the fact if I'm angry or upset or defiant. I have attention deficit and impulsive type where it seems like I'm manic all the time and people perceive that where the fact that I've been threatening or violent, it's not true. People that know me know that I have a pretty mild demeanor." He denied possessing or drinking pruno.

The court found that Shelton continued to represent a substantial danger of physical harm to others, as a result of his mental disorder, and ordered Shelton's commitment extended until February 7, 2015. This timely appeal followed.

## II.    DISCUSSION

"Under section 1026.5, subdivision (b)(1), '[a] person may be committed beyond the term prescribed by subdivision (a) only under the procedure set forth in this subdivision and only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others.' At no less than 90 days before the term of commitment ends, the prosecuting attorney may file a petition for extended commitment in the superior court which issued the original commitment. (§ 1026.5, subd. (b)(2).) The person named in the petition has a right to be represented by an attorney and the right to a jury trial. (§ 1026.5, subd. (b)(3).) If, after trial, the court or jury finds the patient 'by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others,' the patient will be recommitted for an additional period of two years from the date of termination of the previous commitment. (§ 1026.5, subd. (b)(8).)" (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1159.)

Shelton maintains that the extension order must be reversed because his defense counsel did not have the unconditional right to waive jury trial over Shelton's objection, absent a finding that he was not competent to make the decision himself. Shelton relies on a now depublished opinion, *People v. Tran* (2013) 216 Cal.App.4th 102, review

4

granted August 14, 2013, S211329, which he contends makes clear "that defense counsel has some right to waive jury trial, but not over the objection of her client unless it can be shown on the record that he lacks the capacity to make that decision, and there was no attempt in this case to make such a showing." Citable precedent suggests otherwise.

The federal and state Constitutions guarantee the right to a jury trial in criminal cases, and that right can be waived only by the defendant personally. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.) However, "[t]he right to trial by jury at a civil extension hearing is statutory, not constitutional. (See § 1026.5, subd. (b)(3), (4))." (*People v. Givan* (2007) 156 Cal.App.4th 405, 410.) Section 1026.5, subdivision (b)(3) provides, in part, "When the petition is filed, the court shall advise the person named in the petition of the right to be represented by an attorney and of the right to a jury trial." Subdivision (b)(4) provides, in part, "[t]he trial shall be by jury unless waived by both the person and the prosecuting attorney." Subdivision (b)(7) provides that the person "shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings. All proceedings shall be in accordance with applicable constitutional guarantees."

In *People v. Powell* (2004) 114 Cal.App.4th 1153, 1157 (*Powell*), the defendant demanded a jury for his section 1026.5 trial extending his commitment to a state hospital. The trial court denied the request on the ground that he had already waived a jury. The defendant disagreed, asserting that his attorney had waived a jury. On appeal, the defendant contended that the right to jury trial, like that in a criminal case, must be personally waived. (*Powell,* at p. 1157.) The Court of Appeal disagreed, noting that a section 1026.5 extension trial is a civil proceeding directed at treatment, not punishment. (*Ibid.*)

The *Powell* court cited *People v. Superior Court* (*Williams*) (1991) 233 Cal.App.3d 477, 488: " '[A]lthough many constitutional protections relating to criminal proceedings are available in extension proceedings, the application of all such protections is not mandated by section 1026.5. The statutory language merely codifies the application of constitutional protections to extension hearings mandated by judicial

5

decision.' " (*Powell, supra,* 114 Cal.App.4th at pp. 1157–1158.)  The *Powell* court concluded that, like the protections of the privilege against self-incrimination, the ex post facto clause, and the double jeopardy clause, the personal waiver of a jury trial was not applicable at a recommitment trial.  (*Powell*, at p. 1158.)  The *Powell* court reasoned: "An insane person who is 'a substantial danger of physical harm to others' (§ 1026.5, subd. (b)(1)) should not be able to veto the informed tactical decision of counsel." (*Powell*, at p. 1158.)  Accordingly, "counsel may waive jury trial over objection of his or her client in a '[NGI]' commitment extension trial." (*Id.* at p. 1156.)

We find the *Powell* court's reasoning persuasive.  And, *Powell*'s holding is not an anomaly.  In a variety of situations involving involuntary commitment, the California courts have held that a jury trial may be waived by counsel, over the defendant's objection.  (*People v. Barrett* (2012) 54 Cal.4th 1081, 1105 (*Barrett*) [civil commitment of "mentally retarded" person who is a "danger" to herself or others]; *People v. Masterson* (1994) 8 Cal.4th 965, 972, 974 (*Masterson*) [competency proceeding]; *People v. Montoya* (2001) 86 Cal.App.4th 825, 829 [mentally disordered offender proceeding]; *People v. Otis* (1999) 70 Cal.App.4th 1174, 1177 [same].)

In *Barrett, supra,* 54 Cal.4th 1081, our Supreme Court first noted that, unlike most other involuntary commitment schemes, there is no statute authorizing a jury to determine whether someone is mentally retarded and dangerous for purposes of a Welfare and Institutions Code, section 6500 commitment.  (*Barrett,* at p. 1096.)  However, the parties both "invoke[d] a long and unbroken line of California appellate court cases holding or assuming—largely on the basis of federal and state equal protection principles affecting fundamental interests—that persons alleged to be mentally retarded and dangerous cannot be denied a jury altogether where jury trials are granted by statute to persons alleged to be mentally impaired and dangerous under comparable commitment laws." (*Id.* at p. 1097, italics omitted.)  In concluding that counsel had exclusive control over the decision to waive a jury trial, the *Barrett* court relied, in part, on its earlier decision in *Masterson, supra,* 8 Cal.4th 965.  (*Barrett, supra*, 54 Cal.4th at pp. 1101, 1105–1106.)  The court noted that "*Masterson* . . . made the following key point:  'The

sole purpose of a competency proceeding is to determine the defendant's present mental competence, i.e., whether the defendant is able to understand the nature of the criminal proceedings and to assist counsel in a rational manner. [Citations.] Because of this, the defendant necessarily plays a lesser personal role in the proceeding than in a trial of guilt. How can a person whose competence is in doubt make basic decisions regarding the conduct of a proceeding to determine that very question?' (*Masterson, supra*, 8 Cal.4th [at p.] 971.)" (*Barrett,* at p. 1101.) Likewise, the *Barrett* court noted that "the significant cognitive and intellectual deficits that [mental retardation] entails, which appear early in life and never recede, affect the ability to 'make basic decisions' regarding the conduct of the [Welfare and Institutions Code] section 6500 proceeding. [Citation.] Such an individual thus plays a limited 'personal role' in the case, and must rely on counsel to decide all tactical and procedural matters, such as whether to exercise the jury trial right. [Citation.]" (*Id.* at pp. 1103–1104.) Ultimately, the *Barrett* court concluded: "[S]omeone . . . who is alleged to be mentally retarded and dangerous under [Welfare and Institutions Code] section 6500, is not in a position to personally assert or waive the right to jury trial, to sufficiently comprehend the jury trial advisement, or to override the views of counsel on the subject. Sole control over such tactical and procedural decisions rests with counsel, whether or not the client has been consulted or objects." (*Id.* at p. 1105.)

Shelton does not persuade us that it is unreasonable to make a similar assumption in the NGI context. It defies common sense to allow a person previously deemed insane and "a substantial danger of physical harm to others" (§ 1026.5, subd. (b)(1)) to veto the informed tactical decision of counsel.

Even, assuming arguendo, that the court erred in allowing Shelton's counsel to waive jury trial over Shelton's objection, any error was harmless. In *People v. Epps* (2001) 25 Cal.4th 19, 28–29, the Supreme Court explained that where the right to jury trial is created by statute, and not the Constitution, the erroneous denial of a jury trial is subject to the *People v. Watson* (1956) 46 Cal.2d 818 test of harmless error. Given the record before us, which contains ample evidence in support of the extension order, it is

7

not reasonably probable that a different result would have been reached had the extension proceeding been tried before a jury.

### III.    DISPOSITION

The order extending Shelton's commitment to NSH is affirmed.

_____
Bruiniers, J.

We concur:

_____
Jones, P. J.

_____
Needham, J.