Filed 11/1/22 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re T.O., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Appellant, v. T.O., Defendant and Respondent. | E077783 (Super. Ct. No. SWJ12000222) **ORDER MODIFYING OPINION** **[NO CHANGE IN JUDGMENT]** |

The opinion filed in this matter on October 18, 2022, is modified as follows:

The opinion is modified to delete the citation to *People v. Law* (2020) 48 Cal.App.5th 811, 819 on page 7 on the opinion, and replace the citation with *People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.

CERTIFIED FOR PUBLICATION

CODRINGTON
J

We concur:

RAMIREZ
P. J.

McKINSTER
J.

1

Filed 10/18/22 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re T.O., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | E077783 |
| Plaintiff and Appellant, | (Super. Ct. No. SWJ2000222) |
| v. | OPINION |
| T.O., | |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County. Mark E. Petersen and Bonnie Dumanis, Judges. Affirmed.

Michael A. Hestrin, District Attorney, and Natalie M. Lough, Deputy District Attorney, for Plaintiff and Appellant.

Steven L. Harmon, Public Defender, and William A. Meronek, Deputy Public Defender, for Defendant and Respondent.

# I.

## INTRODUCTION

This is an appeal by the People after the juvenile court's order declaring defendant and respondent T.O. (minor) a ward of the court and placing him in a secure local facility for committing a sexual offense against his seven-year-old cousin. The People contend that the juvenile court erred in refusing to impose mandatory sex offender registration pursuant to Penal Code[1] section 290.008 because the court improperly relied on a strict interpretation of section 290.008 without adequately considering the illogical or consequences and harmonizing the statutory scheme. Based on the legislative intent in enacting changes to the juvenile delinquency provisions and the plain language of section 290.008, we affirm the judgment.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2020, then 17-year-old minor pulled his seven-year-old cousin, Jane Doe, into a bedroom, covered her mouth with a scarf, and then anally and vaginally raped her. Jane reported the sexual assault to her mother and aunt the following day. Minor was subsequently arrested.

---

[1] All future statutory references are to the Penal Code unless otherwise stated.

On May 6, 2020, a juvenile delinquency petition was filed charging minor, who was six weeks shy of his 18th birthday, with rape of a child under 14 years old (§ 261, subd. (a)(2)) and forcible sodomy on a child under 14 years old (§ 269, subd. (a)(3)).

On May 7, 2020, the Riverside County District Attorney's Office filed a request to transfer jurisdiction to adult criminal court pursuant to Welfare and Institutions Code section 707, subdivision (a)(1).

On April 13, 2021, the juvenile court issued a written order denying the People's request to transfer the matter to adult court. The court thereafter referred the matter to the probation department for dispositional recommendations.

The probation department pointed out three possible dispositions for minor: the Alan M. Crogan Youth Treatment and Education Center (YTEC), Pathways to Success (Pathways), or the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ). YTEC "is a secure treatment facility, operating using the same basic levels of promotion of a high school campus." Pathways is "a secured treatment environment with a four-tiered school campus model resembling" the YTEC. Regarding sexual behavior treatment at Pathways, the probation officer noted that "a modified version of the Department of Juvenile Justice's (DJJ) program was developed" and that the "youth do not have to register as a sex offender." The probation officer also pointed out that "[o]n June 30, 2021, DJJ will cease accepting youth into the program who were not ordered prior to that date, with a final closure of their facility in 2023" and that youths "must register as sex offenders" if placed in the DJJ program. Following further

3

interviews and meetings, the probation officer ultimately recommended that minor be placed in the Pathways program.

The parties thereafter disputed whether minor would be required to register as a sex offender pursuant to section 290.008 upon competition of the Pathways program should he admit the allegations in the delinquency petition. The sole disputed issue was whether the commitment to a local secure facility required sex offender registration following Senate Bill No. 823 (Senate Bill 823), which codified the plan to close the DJJ within the Department of Corrections and Rehabilitation and establish local programs.

On July 22, 2021, after reviewing the briefs and hearing arguments from the parties, the juvenile court denied the People's request to require minor to register as a sex offender pursuant to section 290.008. After noting that Senate Bill 823 was silent on the issue of registration under section 290, the court explained its ruling as follows: "The relevant bills, the new bills that came out, did not discuss or did not accomplish anything in regards to registration. But when you look at . . . section 290.008, subdivision (a), in the Court's view, this very straightforwardly premises mandatory sex offender registration for juveniles on being, quote, discharged or paroled from the California Department of Corrections and Rehabilitation. [¶] . . . [¶] . . . [I]t's important to note that there is no similar requirement of registration for wards who have been committed to juvenile hall for the same sexual offense. So just to kind of stop and pause there as to that point, the Legislature did carve out situations in which the minor, as a ward, must register as a sex offender, and then in other areas where they're not required to register as

4

a sex offender. So, again, you have the requirement upon a discharge from the Youth Authority or DJJ. We do not have the requirement perhaps on a discharge from juvenile hall. [¶] . . . [¶] It's my belief that the Court does not have the power, outside of . . . section 290.008, to order a minor to register. As stated in the case of *People versus Eastman*,[2] a 2018 case, a trial court may not order an individual to register under section 290 when that individual does not fall within the scope of the act. Also it was stated in *Derrick B.*,[3] a California Supreme Court case, that discretionary sex offender registration provisions do not apply in juvenile cases. [¶] To me, as I look at the law right now as it stands today, I think it's a pretty straightforward answer. If the minor is not committed to the custody of the Department of Corrections, they cannot be ordered to register as a sex offender. [¶] Now, I don't know what the Legislature thought of when they created or when [Senate] [Bill] 823 was being put together and passed, but clearly the law, as previously written and as written now, is very clear that they know the issue. The Legislature knows that there's an issue regarding registration. And if they wanted minors to now register after completing a local program, they could have ordered that, and they did not. [¶] . . . [¶] I believe based on the case law that I already cited and the law, as it exists today, I simply cannot add to or create a requirement that a minor register as the law stands today. [¶] Now, this may be fixed later down the road. The Legislature may decide otherwise in the future, and they may amend certain things. But as it stands today,

---

[2] *People v. Eastman* (2018) 26 Cal.App.5th 638.

[3] *In re Derrick B.* (2006) 39 Cal.4th 535.

5

I believe I'm without authority to order a minor to register. . . . [¶] So I would not be imposing registration, whether it be in an admission, at a trial, at a jurisdictional contested hearing. Regardless of how this case goes, I will not be ordering registration."

On July 26, 2021, pursuant to a negotiated agreement, minor admitted that he had raped a child under 14 years of age and seven or more years younger than him (§§ 261, subd. (a)(2), 269, subd. (a)(1)). The juvenile court thereafter declared minor a ward of the court, dismissed the remaining allegation in the petition, and placed him in the Pathways program on various terms and conditions for a period of four years. The court declined to impose sexual registration pursuant to section 290.008 based on the prior determination. The People timely appealed.

III.

DISCUSSION

The People argue that the juvenile court erred in refusing to impose mandatory sex offender registration because its statutory interpretation of section 290.008 misconstrued the legislative intent by focusing solely on the plain language of the statute without harmonizing the law in the context of the entire statutory scheme. The People also assert the court ignored the established presumption against a repeal by implication and inadequately considered the results of its interpretation. The People further contend that application of the statute violates the equal protection clause because in-state juveniles are treated differently than out-of-state juveniles with respect to sex offender registration.

6

Minor initially responds that the matter is not cognizable on appeal because the court's order is lawful.  As to the merits, minor contends the juvenile court properly denied the People's request to impose a registration requirement because the plain language of section 290.008 does not include sexual offender registration for those minors committed to a county program such as Pathways and that the People did not demonstrate a valid exception to the plain language rule of statutory construction. Finally, minor asserts that the People's equal protection argument fails.

A.  *Standard of Review*

We review questions of statutory interpretation de novo.  (*People v. Lewis* (2021) 11 Cal.5th 952, 961; *In re Isabella G.* (2016) 246 Cal.App.4th 708, 718 ["Our review of the interpretation and application of a statute is de novo."].)  As with any case involving statutory interpretation, our primary goal is to ascertain and effectuate the Legislature's intent.  (*People v. Lewis*, *supra*, at p. 961.)  We begin by examining the statute's words, as the most reliable indicator of legislative intent, giving them a plain, usual and commonsense meaning.  (*People v. Law* (2020) 48 Cal.App.5th 811, 819.)  "When the language of a statute is clear, we need go no further.  However, when the language is susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.  [Citations.]"  (*People v. Flores* (2003) 30 Cal.4th 1059, 1063.)

7

B. *Appealability*

An appellate court has "no authority to hear an appeal in the absence of appellate jurisdiction." (*In re Almalik S.* (1998) 68 Cal.App.4th 851, 854.) Appeals from juvenile court orders and judgments are permitted only as provided by statute: "The People's right to appeal in . . . juvenile court proceedings is conferred exclusively by statute." (*People v. Superior Court* (*Arthur R.*) (1988) 199 Cal.App.3d 494, 497.) "It is settled that the right of appeal is statutory and that a judgment or order is not appealable unless expressly made so by statute. [Citations.] The orders, judgments and decrees of a juvenile court [that] are appealable are restricted to those enumerated in [Welfare and Institutions Code] section 800 [citations]. . . ." (*People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 709, disapproved on another ground in *People v. Green* (1980) 27 Cal.3d 1, 33-34; *In re Almalik S.*, *supra*, at p. 854.)

The People assert that the order at issue here is appealable under Welfare and Institutions Code section 800, subdivision (b)(5). That provision provides that the People may appeal from "[t]he imposition of an unlawful order at a dispositional hearing, whether or not the court suspends the execution of the disposition." (Welf. & Inst. Code, § 800, subd. (b)(5).)

The People contend the juvenile court's order denying its request to impose a registration requirement is unlawful because the plain language of section 290.008 imposes a mandatory registration requirement for individuals adjudicated a ward of the court and committed to the statutory equivalent of DJJ. The crux of the matter is the

8

juvenile court's statutory interpretation of section 290.008. And depending on our review of the juvenile court's statutory interpretation of the law, the court's order may or may not be lawful. We find this issue appealable under Welfare and Institutions Code section 800, subdivision (b)(5), and will therefore address the merits of the People's argument concerning the purported flawed statutory construction analysis of section 290.008 by the juvenile court.

C. *Senate Bill 823*

On September 30, 2020, Senate Bill 823 (2019-2020 Reg. Sess.) became effective. On May 14, 2021, Senate Bill No. 92 (2021-2022 Reg. Sess.) (Senate Bill 92) became effective. This bill made some amendments to the laws implemented by Senate Bill 823.[4]

Through these bills, the Legislature has reduced the maximum period of confinement a juvenile ward faces when committed to DJJ. Before this change in law, a juvenile could be committed for the maximum term an adult would face if convicted of the same offense. (Former Welf. & Inst. Code, § 731, subd. (c).) Under the current law, however, a juvenile ward shall not be committed to DJJ "for a period that exceeds the middle term of imprisonment that could be imposed upon an adult convicted of the same offense." (Welf. & Inst., Code, § 730, subd. (a)(2).)

---

[4] Senate Bill 823 was operative from September 30, 2020, to July 1, 2021. As of January 1, 2022, it will be deemed repealed. (See former Welf. & Inst. Code, § 731, subd. (d).)

In addition, the Legislature has announced its intent to close DJJ, which will be effective June 30, 2023. (Welf. & Inst. Code, § 736.5, subd. (e).) Commencing July 1, 2021, responsibility for all juvenile wards will shift to county governments. (Welf. & Inst. Code, § 736.5, subd. (a).) Welfare and Institutions Code section 736.5, subdivision (a) explicitly provides, "It is the intent of the Legislature to close the Division of Juvenile Justice within the Department of Corrections and Rehabilitation, through shifting responsibility for all youth adjudged a ward of the court, commencing July 1, 2021, to county governments and providing annual funding for county governments to fulfill this new responsibility." (Welf. & Inst. Code, § 736.5, subd. (a).)

Furthermore, the Legislature has announced that, beginning July 1, 2021, a juvenile court (with certain limited exceptions) may no longer commit a ward to DJJ unless the ward is transferred to a criminal court under Welfare and Institutions Code section 707, subdivision (b). (Welf. & Inst. Code, § 736.5, subds. (b), (c).) The exceptions are as follows: "Pending the final closure of [DJJ], a court may commit a ward who is otherwise eligible to be committed under existing law and in whose case a motion to transfer the minor from juvenile court to a court of criminal jurisdiction was filed. The court shall consider, as an alternative to commitment to the [DJJ], placement in local programs, including those established as a result of the implementation of Chapter 337 of the Statutes of 2020." (Welf. & Inst. Code, § 736.5, subd. (c).)

In the present matter, minor was adjudged a ward of the juvenile court on July 26, 2021, well after the effective date of Senate Bill 823 and before it was repealed, and after

10

the juvenile court could not commit minor to the DJJ. He was committed to the Pathways program, a local secure program, as opposed to the DJJ, pursuant to Senate Bill 823 and Welfare and Institutions Code section 736.5.

We summarize the Legislative intent for Senate Bill 823, which is instrumental for some of the arguments. In enacting Senate Bill 823, the Legislature declared as follows: "Evidence has demonstrated that justice system-involved youth are more successful when they remain connected to their families and communities. Justice system-involved youth who remain in their communities have lower recidivism rates and are more prepared for their transition back into the community." (Stats. 2020, ch. 337, § 1, subd. (a).)

"To ensure that justice-involved youth are closer to their families and communities and receive age-appropriate treatment, it is necessary to close [DJJ] and move the jurisdiction of these youth to local county jurisdiction." (Stats. 2020, ch. 337, § 1, subd. (b).) In Senate Bill 823, the Legislature enacted Welfare and Institutions Code section 730 to provide for the following commitment options: A juvenile court "may order any of the types of treatment referred to in [Welfare and Institutions Code] [s]ection 727, and as an additional alternative, may commit the minor to a juvenile home, ranch, camp, or forestry camp. If there is no county juvenile home, ranch, camp, or forestry camp within the county, the court may commit the minor to the county juvenile hall." (Wel. & Inst. Code, § 730, subd. (a)(1).) In addition, a ward may be committed "to a sheltered-care facility." (Wel. & Inst. Code, § 730, subd. (a)(1)(B).) A ward may also be placed "at the

11

Pine Grove Youth Conservation Camp" if the ward meets certain placement criteria. (Wel. & Inst. Code, § 730, subd. (a)(1)(D).)

"It is the intent of the Legislature and the administration for counties to use evidence-based and promising practices and programs that improve the outcomes of youth and public safety, reduce the transfer of youth into the adult criminal justice system, ensure that dispositions are in the least restrictive appropriate environment, reduce and then eliminate racial and ethnic disparities, and reduce the use of confinement in the juvenile justice system by utilizing community-based responses and interventions." (Stats. 2020, ch. 337, § 1, subd. (e).)

Finally, the Legislature stated its intent "to end the practice of placing youth in custodial or confinement facilities that are operated by private entities whose primary business is the custodial confinement of adults or youth in a secure setting. It is further the intent of the Legislature to end placements of justice system-involved youth in out of state facilities that do not appropriately address the programming, service, safety, and other needs of placed youth once appropriate and sufficient capacity within California is achieved." (Stats. 2020, ch. 337, § 1, subd. (f).)

D. *Section 290.008*

Section 290.008 sets forth the sex offender registration requirements for juvenile offenders. (*Ruelas v. Superior Court* (2015) 235 Cal.App.4th 374, 380; *In re D.B.* (2014) 58 Cal.4th 941, 946, fn. 3.) Effective January 1, 2021, this statute in relevant part provides: "Any person who, on or after January 1, 1986, is *discharged or paroled from*

12

*the Department of Corrections and Rehabilitation* to the custody of which he or she was committed after having been adjudicated a ward of the juvenile court pursuant to [s]ection 602 of the Welfare and Institutions Code because of the commission or attempted commission of any offense described in subdivision (c) shall register in accordance with the Act unless the duty to register is terminated pursuant to [s]ection 290.5 or as otherwise provided by law." (§ 290.008, subds. (a), (g), italics added.)

Subdivision (c) of section 290.008 lists the specific offenses that require sex offender registration. (See § 290.008, subd. (c)(1)-(3).) There is no dispute here that minor's admitted offense would qualify for sex offender registration.

Subdivision (d) of section 290.008 provide for tiered periods of registration. Specifically, section 290.008, subdivision (d)(1) declares, "A tier one juvenile offender is subject to registration for a minimum of five years. A person is a tier one juvenile offender if the person is required to register after being adjudicated as a ward of the court and *discharged or paroled from the Department of Corrections and Rehabilitation* for an offense listed in subdivision (c) that is not a serious or violent felony as described in subdivision (c) of [s]ection 667.5 or subdivision (c) of [s]ection 1192.7." (§ 290.008, subd. (d)(1), italics added.) Subdivision (d)(2) states, "A tier two juvenile offender is subject to registration for a minimum of 10 years. A person is a tier two juvenile offender if the person is required to register after being adjudicated as a ward of the court and *discharged or paroled from the Department of Corrections and Rehabilitation* for an offense listed in subdivision (c) that is a serious or violent felony as described in

13

subdivision (c) of [s]ection 667.5 or subdivision (c) of [s]ection 1192.7." (§ 290.008, subd. (d)(2), italics added.)

Finally, section 290.008, subdivision (e) states, "*Prior to discharge or parole from the Department of Corrections and Rehabilitation*, any person who is subject to registration under this section shall be informed of the duty to register under the procedures set forth in the Act.  Department officials shall transmit the required forms and information to the Department of Justice."  (§ 290.008, subd. (e), italics added.)

E.  *Statutory Interpretation Analysis*

The plain language of section 290.008 "requires registration of juvenile wards *only* when they are discharged or paroled from the [DJJ] after having been committed for one of the enumerated offenses."  (*In re Bernardino S.* (1992) 4 Cal.App.4th 613, 619-620, italics added.)  Courts have also construed the mandatory sex offender registration requirement to apply only to a minor committed to the DJJ.  (See *Ruelas v. Superior Court*, *supra*, 235 Cal.App.4th at p. 380; *In re Alex N.* (2005) 132 Cal.App.4th 18, 24.)  Further, the juvenile court does not have the authority to impose discretionary sex offender registration on juvenile offenders as it does with adult offenders.  (*In re Derrick B.*, *supra*, 39 Cal.4th at pp. 537-540; see also § 290, subd. (f) ["Nothing in this section shall be construed to require a ward of the juvenile court to register under the Act, except as provided in [s]ection 290.008."].)

As the People acknowledge, the plain language of section 290.008 makes clear that a juvenile court cannot require a juvenile offender to register as a sex offender unless

14

the minor (1) committed an enumerated offense and (2) was adjudicated a ward of the court and "discharged or paroled from the Department of Corrections and Rehabilitation." The provision "discharged or paroled from the Department of Corrections and Rehabilitation" appears four times in the language of section 290.008. The Legislature could not have been more clearer on this requirement. The plain, commonsense language, "discharged or paroled from the Department of Corrections and Rehabilitation," requiring mandatory registration is unequivocal. The statute's words patently indicate the Legislature's intent that mandatory registration is only required for those juvenile offenders committed and discharged or paroled from the DJJ. There is no ambiguity in the plain language of section 290.008. "When the language of a statute is clear, we need go no further." (*People v. Flores*, *supra*, 30 Cal.4th at p. 1063.)

Contrary to the People's position, the language of section 290.008 does not include "discharge or parole" from a secure county program or similar DJJ program, but a commitment or "discharge or parole" from the DJJ. Hence, we disagree with the People that the Legislature intended to include local secure facilities, such as Pathways, as "equivalents" to DJJ. As noted by the probation officer, Pathways is "a secured treatment environment with a four-tiered school campus model resembling" the YTEC and that the sexual behavior treatment at Pathways is "a modified version" of the DJJ program. The Department of Corrections and Rehabilitation includes the DJJ, but does not include Pathways or any other local county program. County managed programs are not equivalent to DJJ, rather they are an alternative to DJJ. (See § 13015, subd.

15

(c)(2)(D)(iv), ["'Facility type' includes . . . local facilities developed as an alternative to Division of Juvenile Justice facilities."].)  Accordingly, mandatory sex offender registration may not be imposed on juveniles, like minor, who were committed as wards to a county-administered program, such as Pathways, rather than to the DJJ.  The language of section 290.008 "is clear and lends itself to only one reasonable interpretation."  (See, e.g., *In re D.B.*, *supra*, 58 Cal.4th at p. 947.)

The People argue that it appears section 290.008 is in conflict with Welfare and Institutions Code section 736.5 because "the latter requires a ward be committed to DJJ for an enumerated offense before the court can impose a registration requirement on a juvenile offender, whereas the former eliminates DJJ and requires all adjudicated minors be discharged or transferred out of DJJ by 2023."  The People thus believe the juvenile court's "statutory construction analysis misconstrues the legislative intent by focusing solely on the plain language of . . . section 290.008 without harmonizing the statute in the context of the entire statutory scheme, ignoring the established presumption against a repeal by implication, and not adequately considering the results of its interpretation."  It appears the People are suggesting that a juvenile offender would not be subject to registration under section 290.008 if a plain reading of the statute is construed since section 290.008 "does not address Welfare and Institutions Code section 736.5 or the pending closure of DJJ in any way."  Although we agree with the People that section 290.008 does not contemplate Welfare and Institutions Code section 736.5 and vice versa, this issue is for the Legislature to resolve.  As the juvenile court stated, section

16

290.008 also does not address a discharge from juvenile hall. The Legislature is very well aware of the consequences of requiring sex offender registration, as well as capable of crafting legislation that distinguishes between juvenile offenders convicted in adult court and those adjudicated in juvenile court.

Furthermore, the People misconstrue these provisions. These statutory provisions do not suggest sex offender registration for a juvenile offender is no longer possible. A juvenile offender may still be subjected to registration if the juvenile's case is transferred to adult criminal court under Welfare and Institutions Code section 707, subdivision (b). In addition, a juvenile may potentially be committed to DJJ before its closure so long as "a motion to transfer the minor from juvenile court to a court of criminal jurisdiction was filed." (Welf. & Inst. Code, § 736.5, subd. (c).) The transfer motion does not need to have been granted, just filed. Section 290.008 and Welfare and Institutions Code section 736.5 may be harmonized as the latter only restricts the type of juveniles who may be committed to DJJ, and thus subjected to section 290.008's registration requirement while DJJ still remains open.

We also disagree with the People's insinuation that Welfare and Institutions Code section 736.5 impliedly repeals section 290.008. "Absent an express declaration of legislative intent, we will find an implied repeal 'only when there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are "irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation."'" (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 477, quoting *In*

17

*re White* (1969) 1 Cal.3d 207, 212.)  As explained above, we believe that there is a rational basis for harmonizing section 290.008 and Welfare and Institutions Code section 736.5.

Moreover, even if the juvenile court purportedly erred in only focusing on the plain language of section 290.008, an examination of Senate Bill 823, the legislative intent of Senate Bill 823, the legislative history of juvenile delinquency laws, public policy, and the statutory scheme of which the statute is a part supports the interpretation that only those juvenile offenders committed and discharged or paroled from DJJ may be subjected to mandatory registration.  As noted previously, in enacting Senate Bill 823, the Legislature declared that "[e]vidence has demonstrated that justice system-involved youth are more successful when they remain connected to their families and communities."  (Stats. 2020, ch. 337, § 1, subd. (a).)  The Legislature also stated that "[j]ustice system-involved youth who remain in their communities have lower recidivism rates and are more prepared for their transition back into the community."  (Stats. 2020, ch. 337, § 1, subd. (a).)  For these reasons, the Legislature deemed "it is necessary to close the [DJJ] and move the jurisdiction of these youth to local county jurisdiction" so that the juvenile youths "are closer to their families and communities and receive age-appropriate treatment."  (Stats. 2020, ch. 337, § 1, subds. (a), (b).)

It was also "the intent of the Legislature and the administration for counties to use evidence-based and promising practices and programs that improve the outcomes of youth and public safety, reduce the transfer of youth into the adult criminal justice

18

system, ensure that dispositions are in the least restrictive appropriate environment,

reduce and then eliminate racial and ethnic disparities, and reduce the use of confinement

in the juvenile justice system by utilizing community-based responses and interventions."

(Stats. 2020, ch. 337, § 1, subd. (e).)

The Legislature also declared its intent "to end the practice of placing youth in

custodial or confinement facilities that are operated by private entities whose primary

business is the custodial confinement of adults or youth in a secure setting.  It is further

the intent of the Legislature to end placements of justice system-involved youth in out of

state facilities that do not appropriately address the programming, service, safety, and

other needs of placed youth once appropriate and sufficient capacity within California is

achieved."  (Stats. 2020, ch. 337, § 1, subd. (f).)

These county-based facilities thus address different needs and purposes; serving as

an alternative to DJJ rather than an equivalent.  (Sen. Bill 823 (2019-2020 Reg. Sess.)),

§ 15; see also § 13015, subd. (c)(2)(D)(iv) ["'Facility type' includes . . . local facilities

developed as an alternative to Division of Juvenile Justice facilities."].)  Additionally, the

Legislature knew how to extend section 290.008's reach to facilities that are "equivalent

to the [DJJ]" with respect to out-of-state facilities, requiring sex offender registration for

"[a]ny person who is discharged or paroled from a facility in another state that is

equivalent to the [DJJ]" for a comparable qualifying offense.  (§ 290.008, subd. (b).)  If

the Legislature had meant for mandatory sex offender registration to apply to in-state

juveniles discharged or paroled from county-administered facilities created by Senate Bill

19

823 it could have amended section 290.008, subdivision (a) to reference such facilities or by broadening the language to include them as equivalent facilities. The Legislature, however, did not do so.

Further, as evidenced by the tiered system, it appears the public and the Legislature have recognized that some sex offenders, especially juveniles, may be rehabilitated. In 2018, the Legislature adopted Senate Bill No. 1494 (2017-2018 Reg. Sess.) which, amongst other things, modified sex offender registration for both juveniles and adults to create a tiered system. (See §§ 290, subd. (d), 290.008, subd. (d).) For juvenile offenders, the Legislature appears to have determined that the risk of recidivism is low enough and the detrimental effects of sex offender registration high to justify no sex offender registration given their age and the amenability of juveniles to the types of treatment offered in local secure facilities. (See e.g. *In re Bernardino S.*, *supra*, 4 Cal.App.4th at p. 620 ["The Legislature recognized the 'stigma' associated with sex offender registration, and acknowledged some tension between registration and the rehabilitative goals of the juvenile court law."].)

We also reject the People's contention that the juvenile court's interpretation of section 290.008 would lead to absurd or illogical consequences. As our Supreme Court concluded, in the context of interpreting Welfare and Institutions Code sections 731 and 733: "These potential consequences . . . are not so *absurd* that we must override the plain meaning of the statutory language. To justify departing from a literal reading of a clearly worded statute, the results produced must be so unreasonable the Legislature could not

20

have intended them. [Citation.] We cannot so conclude here. [Welfare and Institutions Code section] [s]ection [736.5] was enacted as part of comprehensive realignment legislation. [Citation.] The Legislature's primary purpose in enacting the statute was to reduce the number of juvenile offenders housed in state facilities by shifting responsibility to the county level "'for all but the most serious youth offenders.'" [Citations.] Although reasonable minds may debate the wisdom of the chosen approach, decisions about how to limit [DJJ] commitments are the Legislature's to make."[5] (*In re D.B.*, *supra*, 58 Cal.4th at pp. 947-948.)

F. *Equal Protection*

Finally, the People contend that treating juvenile wards placed in out-of-state facilities that are "equivalent to the [DJJ]" (§ 290.008, subd. (b)) than those committed to in-state local facilities (see § 290.008, subd. (a)) with respect to sex offender registration implicates the equal protection clause. We disagree.

"The crux of the constitutional promise of equal protection is that persons similarly situated shall be treated equally by the laws. [Citation.] However, neither clause [of the United States or California Constitutions] prohibits legislative bodies from making classifications; they simply require that laws or other governmental regulations be justified by sufficient reasons. The necessary quantum of such reasons varies,

---

[5] We believe the factual background of minor's crime supports a need for minor to register and that the statute ignores public safety. However, that is a policy concern for the Legislature and beyond our ability to change the language of the statute which is clear and unambiguous. The statute ties our hands and we cannot legislate from the bench.

21

depending on the nature of the classification." (*In re Evans* (1996) 49 Cal.App.4th 1263, 1270; see *People v. Nolasco* (2021) 67 Cal.App.5th 209, 220.)  Classifications based on race or national origin or which affect fundamental rights are given strict scrutiny.  Classifications based on sex or illegitimacy are given intermediate scrutiny.  (*Clark v. Jeter* (1988) 486 U.S. 456, 461.)  All other statutory classifications are evaluated merely for the existence of a rational basis supporting its enactment.  (*In re Evans*, *supra*, at p. 1270; *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.)

Prisoners are not a suspect class and they have no fundamental interest in a specific term or type of imprisonment.  (*People v. Yearwood* (2013) 213 Cal.App.4th 161, 178; *People v. Wilkinson* (2004) 33 Cal.4th 821, 838; *In re J.M.* (2019) 35 Cal.App.5th 999, 1010 ["[J]uveniles have not been recognized as a suspect class."].)  "Where, as here, a disputed statutory disparity implicates no suspect class or fundamental right, 'equal protection of the law is denied only where there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose."'" (*Johnson v. Department of Justice*, *supra*, 60 Cal.4th at p. 881.)  "'This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve.  Nor must the underlying rationale be empirically substantiated. [Citation.]  While the realities of the subject matter cannot be completely ignored [citation], a court may engage in "'rational speculation'" as to the justifications for the legislative choice [citation].  It is immaterial for rational basis review "whether or not" any such speculation has "a foundation in the record."' [Citation.]  To mount a

22

successful rational basis challenge, a party must "'negative every conceivable basis'" that might support the disputed statutory disparity. [Citations.] If a plausible basis exists for the disparity, courts may not second-guess its "'wisdom, fairness, or logic.'"" (*Ibid.*)

In the present matter, we are not persuaded that juvenile wards placed in out-of-state facilities that are "equivalent to the [DJJ]" are similarly situated to juvenile wards committed to in-state *local* facilities with respect to registration. The lawmakers had to create two different classifications for in-state and out-of-state juvenile offenders because each group's situation is different. For an out-of-state wards, the juvenile court must examine whether their commitment facility is "equivalent to the [DJJ]," a task presumably made necessary because there is no DJJ outside of California. (§ 290.008, subd. (a).) However, for in-state wards the court need simply determine if the juvenile was "discharged or paroled" from the DJJ. (§ 290.008, subd. (a).) The two groups are not similarly situated. (See e.g. *People v. Hernandez* (1979) 100 Cal.App.3d 637, 645, disapproved of on other grounds in *People v. Williams* (1983) 140 Cal.App.3d 445, 450 [persons with an in-state prior are not similarly situated to persons with an out-of-state prior because "the Legislature may have reasonably intended two different classifications and if so, since both are treated similarly within the class, the statute is uniform and does not violate equal protection."].)

Assuming for the sake of argument that juvenile wards committed to out-of-state facilities "equivalent to the [DJJ]" are similarly situated to juvenile wards who are placed in an in-state local facility for purposes of sex offender registration, treating wards

23

differently based on their placement is rationally related to a legitimate governmental purpose. The Legislature may have reasonably concluded that some out-of-state facilities may be the same as the DJJ, thus requiring sex offender registration for "[a]ny person who is discharged or paroled from a facility in another state that is equivalent to the [DJJ]" for a comparable qualifying offense. (§ 290.008, subd. (b).) The Legislature utilized the word "equivalent," as opposed to "alternative" to the DJJ. The Legislature presumably used the word "equivalent" to the DJJ so that they did not have to name every out-of-state facility that is equivalent to, or tantamount to, the DJJ. Notably, the lawmakers did not use the words "local" and/or "county" in the phrase "from a facility in another state that is equivalent to the [DJJ]." The Legislature could rationally conclude that requiring juvenile wards placed in out-of-state facilities that are "equivalent" to the DJJ to register was necessary to solve the issue of those wards who are discharged or paroled to California, thereby aligning subdivisions (a) and (b) of section 290.008. This represents a legislative judgment that every ward who is discharged or paroled from DJJ or an out-of-state facility that is "equivalent to the [DJJ]," following commitment for certain adjudicated offenses, should be treated exactly the same way with respect to sex offender registration, regardless of placement in the DJJ or an out-of-state facility that is "equivalent to the [DJJ]."

"Nothing compels the state 'to choose between attacking every aspect of a problem or not attacking the problem at all.' [Citation.] Far from having to 'solve all related ills at once' [citation], the Legislature has 'broad discretion' to proceed in an

24

incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination." (*People v. Barrett* (2012) 54 Cal.4th 1081, 1110.)  There is no equal protection violation.

## IV.

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PUBLICATION

CODRINGTON
J.

I concur:

McKINSTER
J.

25

[E077783, *In re T.O.; The People v. T.O*.]

Ramirez, P. J., Concurring

I agree with the conclusion, the analysis of the revised statutory scheme, and the discussion of the majority. I write separately only to express concern that the recent legislative actions have omitted an ingredient. In its zeal to insure for juvenile offenders the opportunity to be rehabilitated without the disabilities accompanying a commitment to the Department of Juvenile Justice or a conviction as an adult, which would require sex offender registration, the safety of the public and the trauma to the victim have been overlooked.

I agree with the legislative policy of insuring an opportunity for rehabilitation for persons who commit offenses during their youth, when lack of or incomplete brain development may lead them to commit acts that may not have been committed with the benefit of the wisdom that comes with emotional maturity. This policy has emerged following extensive scientific research and a series of decisions focusing on the lack of cognitive development manifest in youth. "As the United States Supreme Court observed in *Roper v. Simmons* (2005) 543 U.S. 551, 570 [161 L. Ed. 2d 1, 125 S. Ct. 1183], 'the character of a juvenile is not as well formed as that of an adult,' and consequently, '[t]he personality traits of juveniles are more transitory, less fixed.'" (*In re Miguel C*. (2021) 69 Cal.App.5th 899, 907-908.) Scientific research increasingly supports the notion that juveniles are evolving and that developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.

1

As the United States Supreme Court observed, as compared to adults, juveniles have "'[a] lack of maturity and an underdeveloped sense of responsibility'"; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are "not as well formed." (*Roper v. Simmons* (2005) 543 U.S. 551, 569-570 [125 S. Ct. 1183, 161 L. Ed. 2d 1].) These salient characteristics mean that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." (*Id.*, at p. 573 [125 S. Ct. 1183, 161 L. Ed. 2d 1].)

Our nation's High Court therefore concluded that, "juvenile offenders cannot with reliability be classified among the worst offenders." (*Roper v. Simmons, supra*, 543 U.S. at p. 569 [125 S. Ct. 1183, 161 L. Ed. 2d 1].) For this reason, "[a] juvenile is not absolved of responsibility for his actions, but that his transgression 'is not as morally reprehensible as that of an adult.'" (*Graham v. Florida* (2010) 560 U.S. 48, 68 [130 S. Ct. 2011, 176 L. Ed. 2d 825], quoting *Thompson v. Oklahoma* (1988) 487 U.S. 815, 835 [108 S. Ct. 2687, 101 L. Ed. 2d 702] (plurality opinion).)

While the legislation embodies the laudable concern for the rehabilitation of juvenile offenders, it is not counterbalanced by concern for public safety (which was responsible for the massive overhaul by Proposition 21, in 2000, providing prosecutors with discretion to directly file criminal charges in adult court against minors of the age of 14 or older). The pendulum has now swung 180 degrees in the opposite direction.

Here, the denial of the People's petition to transfer the minor's case to adult court through Welfare and Institutions Code section 707, was the singular determinant that he would be retained for the rehabilitative programs available locally, without the requirement of registration as a sex offender. Thus, under the revised statutory scheme, he will suffer no additional burdens such as an adult would suffer if convicted of the same offense. The legislative intent is laudable so far as this minor is concerned and today's decision well interprets the scheme. But the other side of the equation has not been factored: the legislation does not include provisions to address public safety aside from the period of commitment, or consider the trauma suffered by the victim. The Legislature should take these considerations into account to achieve the legislative goals while meeting the concerns of public safety and justice for the victim.

Because the opinion correctly analyzes and interprets the legislation as written, I concur in the judgment.

RAMIREZ
P. J.

3